UNITED STATES of America, Plaintiff,

v.

GLENEAGLES INVESTMENT CO., INC., et al., Defendants.

Civ. No. 80–1424.

United States District Court,
M.D. Pennsylvania.

Sept. 13, 1983.

Beth A. Kaswan, Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for Dept. of Justice.

D. Alan Harris, Sp. Deputy Atty. Gen., Chicago, Ill., for Com. of Pa.

Robert C. Nowalis, Doran & Nowalis, Wilkes-Barre, Pa., for trustee.

Eugene J. Wien, I.R.S., Philadelphia, Pa., for I.R.S.

Joseph Solfanelli, Dolphin, Solfanelli & Butler, Scranton, Pa., for Gleneagles Inv.

Thomas G. Bailey, Jr., David Allen Koenigsberg, Whitman & Ransom, New York City, for Pagnotti Enterprises.

Sidney Levy, Scranton, Pa., for Lackawanna County.

## OPINION

MUIR, District Judge.

### I. Introduction.

The first issue of liability in this case was tried beginning November 2, 1982 and ending March 17, 1983. That issue was whether the IIT mortgages given in substantial part to finance the purchase of Raymond Colliery and its affiliates (hereinafter the Raymond Group) were fraudulent conveyances. In an earlier opinion of this Court, *United States of America v. Gleneagles Investment Co., Inc., et al.,* 565 F.Supp. 556

(M.D.Pa.1983), we concluded that the IIT mortgages were fraudulent.

Trial of the 2nd, 3rd and 4th liability issues started April 18, 1983 and concluded June 28, 1983. This opinion deals with those issues which were tried in series. The 2nd liability issue was whether the 1976 Lackawanna County tax sale of lands subject to the mortgages was valid. The 3rd liability issue was whether a similar 1980 Lackawanna County tax sale was valid. The 4th liability issue was whether the purchaser of the IIT mortgages was a bona fide purchaser.

On June 15, 1983, during the trial on the 2nd liability issue the parties stipulated that the Lackawanna County Tax Claim Bureau had failed to post tax sale notices on those Raymond Colliery properties which the county had purported to sell at the December 17, 1976 and the December 16, 1980 tax sales, that the tax sales were invalid and that no title passed by the tax sales and resultant tax deeds. Defendant Tabor Court Realty was the purchaser of Raymond Colliery's lands at the 1976 tax sale. On the date of the 1976 tax sale, Defendant Pagnotti Associates was the equitable owner of the stock of Tabor Court Realty and became the actual owner in January, 1977. At the December 16, 1980 tax sale, Defendant Joseph Solfanelli purchased the properties for $612,239.56. In January of 1981, Defendant Gleneagles Investment Co., Inc., was incorporated with Joseph Solfanelli as its sole shareholder. Mr. Solfanelli was on December 16, 1980 and is now counsel to the Pagnotti-Tedesco interests. The Lackawanna County Commissioners purported to convey the Raymond Colliery properties to Gleneagles by deed of April 15, 1981. As a result of the June 15, 1983 stipulation, the lands of Raymond Colliery which were ostensibly sold at the tax sales are still owned by Raymond Colliery and its subsidiaries.

The fraudulent mortgages were assigned by IIT to Defendant McClellan Realty Co. on January 26, 1977. On the same date Defendant Pagnotti Enterprises purchased the stock of McClellan Realty. The United States asserts that the mortgages are void in the hands of McClellan Realty because, *inter alia,* McClellan Realty knew or had reason to know that the mortgages were fraudulent.

Following are the Court's findings of fact, discussion and conclusions of law with respect to the fourth issue of liability.

## II. Findings of Fact.

1. Prior to 1972, James Tedesco had numerous contacts with the Raymond Group and particularly with Raymond Colliery and Blue Coal.

2. In 1965, James Tedesco unsuccessfully attempted to purchase the coal lands of Blue Coal.

3. In 1971, James Tedesco and Louis Pagnotti, II, unsuccessfully attempted to purchase the Loree Colliery culm bank which was owned by the Raymond Group.

4. In 1972, Pagnotti Enterprises and the Raymond Group were the two top producers of anthracite coal in the United States.

5. Pagnotti Enterprises, Inc. is owned 34/60 by the Pagnotti Family, 13/60 by Tedesco Corp. and 13/60 by Henry Ventre, Inc.

6. James Tedesco is an experienced coal operator and businessman.

7. James Tedesco has known James Durkin for more than 40 years.

8. In early 1972, James Durkin obtained an option to purchase the stock of Raymond Colliery.

9. Subsequently, James Durkin incorporated Great American Coal Co. and assigned to it his option to purchase the stock of Raymond Colliery.

10. James Durkin financed Great American's purchase of the stock of Raymond Colliery in part through loans obtained from the Old Forge Bank and No. 1 Contracting Co.

11. From 1966 through the present, James Tedesco has been president of Old Forge Bank.

12. James Tedesco and Louis Pagnotti, II are minority shareholders and directors of the Old Forge Bank.

13. No. 1 Contracting Co. is a corporation whose stock is owned by Louis Pagnotti, Inc., Ventre, Inc., and Tedesco Corporation.

14. James Tedesco and Louis Pagnotti, II are shareholders of Tedesco Corporation and Louis Pagnotti, Inc., respectively.

15. At the time James Durkin sought financing from the Old Forge Bank and No. 1 Contracting, he revealed to James Tedesco that he had reached an agreement for the acquisition of Raymond Colliery and its subsidiaries, including Blue Coal.

16. On July 16, 1973, the Old Forge Bank lent James and Anna Jean Durkin $100,000 towards the purchase of Raymond Colliery's stock without the submission by the Durkins of a loan application or financial statements.

17. On July 16, 1973, No. 1 Contracting Co. entered into a transaction framed as a loan whereby No. 1 Contracting Co. ostensibly lent James and Anna Jean Durkin $200,000 towards the purchase of Raymond Colliery's stock and accepted $300,000 in cash as "collateral".

18. James Riddle Hoffa, Sr. supplied the $300,000 used as "collateral" for the $200,000 loan made by No. 1 Contracting Co.

19. James Riddle Hoffa, Sr. was a silent partner of James Durkin in his negotiations to purchase the stock of Raymond Colliery.

20. The $300,000 "collateral" was kept in a safe deposit box in the Old Forge Bank used by companies dominated by James Tedesco and drew no interest.

21. James Durkin obtained a written receipt for the cash collateral signed not by the "lender" but by Mr. Sebastianelli, an officer of the Old Forge Bank.

22. James Tedesco, was president of both Old Forge Bank and No. 1 Contracting Co. James Tedesco as president of the bank did not request loan applications from the Durkins because of his belief that Anna Jean Durkin was wealthy.

23. On August 13, 1973, Old Forge Bank lent Great American $105,000 without submission by Great American of a loan application or financial statements.

24. Because James Tedesco looked to James and Anna Jean Durkin for repayment of the Old Forge Bank loan to Great American, he did not request financial statements for Great American or for the Raymond Group.

25. James Tedesco was not shown any financial statements of the Raymond Group on July 16, 1973 or on August 13, 1973.

26. In the summer of 1973, Hyman Green became a joint venturer with James Durkin and James Riddle Hoffa in the negotiations to purchase Raymond Colliery.

27. Prior to 1973, representatives of several anthracite coal companies, including Joseph Frank a direct assistant of Mr. Tedesco on behalf of Pagnotti Enterprises and Carl Tomaine on behalf of the Raymond Group, entered into agreements to fix prices and control production of anthracite coal.

28. On October 11, 1973, Henry Greenwald, counsel for James Durkin, sought from James Tedesco information regarding the amount of counsel fees and expenses paid by Blue Coal or for which it had become obligated with respect to the antitrust litigation which arose out of the price fixing and production control activities set forth in the last preceding finding of fact. Henry Greenwald explained that this information was needed to resolve a dispute which had arisen in the course of James Durkin's negotiations to purchase Raymond Colliery.

29. On or about October 31, 1973, James Tedesco provided Henry Greenwald with an appraisal of a Bucyrus-Erie Electric Walking Dragline owned by a member of the Raymond Group valuing the dragline at $2,500,000.

30. This appraisal was used by James Durkin to support his efforts to obtain financing from Institutional Investors Trust (IIT) for the purchase of the stock of Raymond Colliery.

31. In early 1974 James Tedesco knew about James Durkin's efforts, after Great

American's purchase of Raymond Colliery, to liquidate the Raymond Group. Specifically, James Tedesco was aware that James Durkin had sold or was attempting to sell equipment, culm banks and draglines owned by the Raymond Group.

32. In January of 1974, James Tedesco had discussions with James Durkin and Hyman Green regarding the possibility that Pagnotti Enterprises might acquire a "lease to exhaustion" of all coal lands of the Raymond Group.

33. The proposal discussed among James Tedesco, Hyman Green, and James Durkin contemplated that Pagnotti Enterprises would have the use of the mining equipment owned by the Raymond Group.

34. James Tedesco did not see any financial statements or data on the financial condition of the Raymond Group at this time.

35. During the January, 1974 negotiations, James Durkin advised James Tedesco that the Raymond Group was losing money on its coal production business and intended to cease operation of the same.

36. No agreement on the lease to exhaustion proposal was reached between James Tedesco, James Durkin, and Hyman Green.

37. Later in 1974, James Durkin and Hyman Green entered into a lease to exhaustion with Lucky Strike Coal Corp. of certain Raymond Group coal lands.

38. Lucky Strike Coal was operated by Louis Beltrami.

39. Prior to April 1974, James Tedesco offered James Durkin $2,500,000 for the Bucyrus-Erie Electric Walking Dragline which was the subject of the appraisal provided by James Tedesco to Henry Greenwald in October of 1973.

40. This offer was not accepted by James Durkin and subsequently the dragline was sold for $3,000,000 to W.R. Grace & Co.

41. On July 18, 1974, James Durkin, Anna Jean Durkin and Hyman Green pledged their Raymond Colliery and Great American stock to IIT as additional collateral for the 1973 loans.

42. In accordance with the pledge agreement, in the event of default IIT had the right to vote the pledged stock and to exercise all powers of an owner with respect to the pledged stock.

43. The Durkins became seriously delinquent in the payment of interest on the Old Forge Bank loan and on the "loan" from No. 1 Contracting Co. obtained by the Durkins on July 16, 1973 in connection with the purchase of Raymond Colliery stock.

44. On May 6, 1975 the interest payable on the $200,000 "loan" from No. 1 Contracting Company to James and Anna Jean Durkin was paid by Blue Coal for the period July 1, 1973 through December 31, 1973.

45. On June 26, 1975, James and Anna Jean Durkin sold their stock in Great American to Hyman Green.

46. After the Durkins sold their stock, James Millard became president of both Raymond Colliery and Blue Coal.

47. James Millard was counsel to Hyman Green at least between 1973 and 1976.

48. In September 1975, James Tedesco negotiated on behalf of Loree Associates to lease a coal breaker to the Durkins for the processing of certain culm banks.

49. In 1975, Raymond Colliery negotiated an agreement with the Lackawanna Tax Claim Bureau to pay its delinquent real estate taxes.

50. Upon signing this agreement, Raymond Colliery paid $95,000 towards its taxes and agreed to pay the balance of $885,-000 in installments during 1976.

51. By early 1976, Raymond Colliery was in default under this agreement.

52. In January, 1976, James Durkin accompanied by Eugene Zafft met with James Tedesco and repaid the $200,000 No. 1 Contracting Co. loan and James Tedesco delivered to them the $300,000 "cash collateral." At this time, James Durkin stated he had assigned his interest in the "cash collateral" to Eugene Zafft.

53. Eugene Zafft was counsel to James Riddle Hoffa at least from 1972 until Hoffa's disappearance in 1975 and in January of 1976 was acting on behalf of Hoffa's estate.

54. At the time the "cash collateral" was returned, James Durkin and James Tedesco exchanged receipts.

55. In February, 1976 Blue Coal negotiated an agreement with the Luzerne County Commissioners to pay its delinquent real estate taxes.

56. Under the agreement, Blue Coal paid $50,000 towards its taxes with further payments to be made from the proceeds of its real estate sales.

57. The $50,000 so paid by Blue Coal was advanced to Blue Coal by IIT and was added to the principal amount of the IIT mortgages. The advance was secured by a promissory note executed by Blue Coal and guaranteed by James Millard.

58. In early 1976, L. Robert Lieb was retained by IIT as special counsel to advise IIT with respect to the Raymond Group loans.

59. L. Robert Lieb was not told about the background or origin of the IIT loans.

60. By mid-1976, Blue Coal was in default under its agreement with the Luzerne County Commissioners.

61. On September 15, 1976, IIT sent notices to Raymond Colliery, Olyphant Associates, Blue Coal and Glen Nan (the borrowing companies) declaring that the mortgage notes under the Note Purchase and Loan Agreement of November 26, 1973 were in default. IIT further advised the borrowing companies that it was accelerating the balances due under the Note Purchase and Loan Agreement and demanded payment of the loan balances. Similar notices of default were sent to the corporate guarantors.

62. On September 15, 1976, IIT made demands upon Lucky Strike to pay to IIT all rents payable by Lucky Strike to the Raymond Group under the lease to exhaustion held by Lucky Strike.

63. On September 29, 1976, IIT confessed judgments against Blue Coal, Raymond Colliery, Olyphant Associates and Glen Nan in the amounts of $3,075,438, $1,865,430, $50,417 and $50,417 respectively.

64. In the fall of 1976, Lawrence Sullivan of IIT approached James Tedesco to discuss the sale of IIT's mortgages to Pagnotti Enterprises.

65. At the meeting with Lawrence Sullivan, James Tedesco indicated a willingness to consider purchasing IIT's mortgages and requested that copies of the mortgages and other data be provided to Pagnotti Enterprises.

66. Pursuant to this request, Lawrence Sullivan sent James Tedesco copies of the four mortgages, one relating to each borrowing company, and an index of the items in the twelve closing binders created by IIT's counsel, Morgan, Lewis and Bockius, after the November 26, 1973 closing of the IIT loans.

67. By October 20, 1976, James Tedesco and his counsel, Morris Gelb of the Scranton law firm of Gelb & Myers, had received the above documents from Lawrence Sullivan.

68. Also during October 1976, James Tedesco was approached by Hyman Green, owner of record of the stock of Raymond Colliery, who represented to James Tedesco that the IIT mortgages could be purchased at a substantial discount.

69. Hyman Green and James Millard used the threat of bankruptcy and the possible county tax sales in an attempt to get IIT to modify or extend the maturity date of the loans.

70. IIT advised Mr. Green that it would not modify the terms or extend the maturity date of the loans.

71. Hyman Green was attempting to find a buyer of IIT's loans and security because he wanted the mortgages to be held by someone who would be more cooperative with the Raymond Group than IIT had been and because IIT had indicated that it would not extend the December 31, 1976 maturity date of the loans or refinance the loans past that date.

72. James Tedesco had a meeting with Hyman Green in late October, 1976 in Hyman Green's offices in New York.

73. Attorney Morris Gelb and his associate, Richard Bishop, as counsel to Pagnotti Enterprises, and James Millard, president of Blue Coal and Raymond Colliery, were also present at the above meeting.

74. James Tedesco and Hyman Green discussed the possible sale of the Raymond Group to Pagnotti Enterprises but James Tedesco lost interest in the possibility of a stock purchase after he and his counsel reviewed the financial information concerning the Raymond Group.

75. The Raymond Group was unable to pay its delinquent and current real estate taxes through December 1976 which aggregated approximately $980,000 for Lackawanna County alone.

76. In the fall of 1976, Luzerne and Lackawanna Counties scheduled real estate tax sales of the bulk of the lands of Raymond Colliery and Blue Coal.

77. On or after October 5, 1976, IIT made efforts to pay Raymond Colliery's and Blue Coal's delinquent real estate taxes. IIT unsuccessfully attempted to negotiate an agreement with the taxing authorities to pay the taxes on an installment basis.

78. Between November 9, 1976 and November 12, 1976, L. Robert Lieb and Allen Katz, counsel for IIT, met with and retained Norman Harris and Merton Jones of Nogi, O'Malley and Harris, a Scranton area law firm, as local counsel to IIT and discussed with them and various county personnel the alternatives available to IIT to protect its mortgages in light of the scheduled county tax sales and the fact that the mortgages were in default.

79. In November, 1976, IIT's counsel visited the Luzerne and Lackawanna County Tax Claim Bureaus.

80. L. Robert Lieb learned during his visit to the County Tax Claim Bureaus that certain real estate taxes owed by Blue Coal and Raymond Colliery pre-dated the November 26, 1973 mortgages. L. Robert Lieb was surprised that real estate taxes which pre-dated the mortgages had not been paid prior to the November 26, 1973 closing, but understood that non-payment of real estate taxes was a method of "borrowing" at an interest rate substantially lower than the prime rate.

81. Because some of the delinquent real estate taxes owed by Raymond Colliery and Blue Coal pre-dated the IIT mortgages, IIT was aware that under Pennsylvania law tax sales based upon such pre-1974 taxes would discharge IIT's mortgages.

82. As a result of IIT's awareness that the tax sales involving taxes predating the mortgages would discharge its mortgages, IIT considered what steps would be necessary to protect its mortgages.

83. Representatives of IIT unsuccessfully attempted to persuade the owners of Blue Coal and Raymond Colliery to pay the delinquent real estate taxes.

84. IIT's counsel learned that the Lackawanna County tax records and files were confused, the Lackawanna County officials were political appointees and the Lackawanna County officials appeared to be assisting a potential purchaser in his effort to obtain Raymond Colliery's lands at a bargain price.

85. James Tedesco's name as a potential purchaser at a bargain price was not mentioned by the Lackawanna County employees.

86. IIT employed a team of accountants to examine Lackawanna County's tax records and employed a consultant to advise IIT as to the advisability of paying taxes on specific parcels of property, purchasing specific parcels of property at the tax sales, purchasing all of the tracts at the tax sales, or a combination of these methods.

87. IIT's accountants were unable to determine the amounts owed on the taxes owed to Lackawanna County.

88. IIT's real estate consultant, Kenneth P. O'Brien, was unable to determine the identity and whereabouts of scores of Raymond Colliery's properties proposed to be offered for tax sale by Lackawanna County

and, as a result, was unable to advise IIT on whether it should pay taxes or bid upon particular parcels of Raymond Colliery property.

89. On November 15, 1976, a meeting between IIT personnel and their counsel, L. Robert Lieb, Allen Katz, Norman Harris, and Merton Jones was held in the New York offices of IIT to develop a strategy to protect the mortgages at the scheduled county tax sales and to consider whether IIT should take possession of the lands in order to be clothed with the benefits accorded a mortgagee in possession.

90. IIT rejected mortgagee in possession status because it believed such a course of action might give rise to potential liabilities to the Raymond Group's creditors.

91. IIT also considered exercising its rights under the stock pledge agreement, voting in a new board of directors for Raymond Colliery, filing on behalf of Raymond Colliery a voluntary bankruptcy petition and attempting to stay the Lackawanna County tax sale.

92. IIT also considered foreclosing on its mortgages but recognized the likelihood that once a foreclosure was commenced, an involuntary bankruptcy proceeding of some sort would probably follow.

93. IIT determined that a bankruptcy should be avoided as it would delay for several years IIT's efforts to collect the amounts due under the mortgages at a time when IIT was experiencing great cash flow problems.

94. In December 1976, Norman Harris, IIT's local counsel, requested Bankruptcy Judge Gibbons in Wilkes-Barre to inform IIT immediately should a bankruptcy petition be filed against Blue Coal or Raymond Colliery.

95. In late November or early December, 1976, IIT's counsel drafted affidavits and pleadings to seek a federal court injunction of the Lackawanna County tax sale of Raymond Colliery's properties on the basis of IIT's contention that the sale would violate due process of law notice requirements.

96. Before IIT had selected a final strategy to be used at the county tax sales, IIT and James Tedesco on behalf of Pagnotti Enterprises resumed negotiations for the purchase of IIT's mortgages by Pagnotti Enterprises.

97. Prior to these negotiations, Pagnotti Enterprises secured an agreement from Hyman Green whereby Hyman Green promised to execute "declarations of no set-off" confirming the balances owed on the IIT loans.

98. Pagnotti Enterprises secured from Hyman Green on December 10, 1976, "declarations of no set-off" confirming the balances of the IIT loans owed ·by the four borrowing companies and warranting that the mortgagors had no knowledge of any claims or defenses to the mortgages.

99. On December 13, 1976, a meeting of IIT, their counsel, and Robert Casper, a real estate appraiser retained by IIT, was held at IIT's offices in New York in order to select a final strategy to be utilized with respect to the county tax sales.

100. Because the December 10, 1976 "declarations of no set-off" were not properly executed, Hyman Green was requested to re-execute "declarations of no set-off" and to have them properly acknowledged.

101. On December 14, 1976, James Tedesco accompanied by Morris Gelb and Richard Bishop, counsel for Pagnotti Enterprises, met with IIT personnel and counsel in New York to negotiate the purchase of IIT's mortgages by Pagnotti Enterprises.

102. Further negotiations were held on December 15, 1976 in the law offices of Gelb & Myers in Scranton, Pennsylvania.

103. The December 15, 1976 meeting was attended by Morris Gelb, L. Robert Lieb, Allen Katz, and Norman Harris and was convened for the purpose of drafting an agreement of sale of the IIT mortgages to Pagnotti Enterprises or its nominee.

104. At the meeting held on December 15, 1976, there were discussions regarding the effect of an intervening bankruptcy on the IIT mortgages and on the duties of the

parties to go forward with the sale of the mortgages in the event of bankruptcy.

105. At the December 14 and 15, 1976 meetings, L. Robert Lieb warned James Tedesco of Hyman Green's bankruptcy threats and specifically negotiated a contract clause providing that a bankruptcy of any of the debtors would have no effect upon the obligation of Pagnotti Enterprises under the mortgage sale contract.

106. Prior to the tax sales, the question of whether other liens on the properties would be divested by a county tax sale was discussed and was a subject of much concern.

107. Morris Gelb was of the view that it was difficult to determine whether or not a tax sale would divest other liens on the properties sold at such a sale.

108. Local counsel for IIT told L. Robert Lieb that a quiet title action would probably be necessary effectively to divest all liens on properties sold at a county tax sale.

109. At the December 14 and 15, 1976 meetings between Pagnotti Enterprises and IIT, counsel for IIT emphasized that the mortgage debts were being sold "as is" and with absolutely no representations or warranties.

110. James Tedesco had previously insisted upon an escape clause for the proposed purchase of the IIT mortgages in the event that there was some invalidity to the mortgages. However, James Tedesco agreed to an unconditional purchase of the mortgages in exchange for a reduction of the purchase price.

111. When negotiating to purchase the IIT mortgages, James Tedesco knew, in addition to the items of his knowledge found above, that the debtors were in default, that the loan balances had been accelerated and that judgments on the unpaid balances had been confessed.

112. There was no discussion between representatives of Pagnotti Enterprises and IIT about the possibility of mortgages being held invalid as fraudulent conveyances.

113. In 1976, L. Robert Lieb had no knowledge or indication of any challenge to the validity of the IIT loans.

114. During the negotiations to purchase the IIT mortgages, James Tedesco and his counsel were given the opportunity to review all the November 26, 1973 loan closing documents.

115. These documents were contained in 12 closing binders prepared by Morgan, Lewis and Bockius after the November 26, 1973 closing of the IIT loans, the index to the binders having been received by James Tedesco and Morris Gelb by October 20, 1976.

116. Copies of most, if not all, of the twelve binders were in the possession of Nogi, O'Malley and Harris, IIT's local counsel in Scranton, Pennsylvania, and were available for review by Pagnotti Enterprises' officers and counsel.

117. All other correspondence and other paperwork relating to the Raymond Group mortgages were kept in three 4-drawer filing cabinets at IIT's New York offices.

118. During the negotiations to purchase the IIT mortgages, James Tedesco knew, or had in his possession the index to the closing document which index showed on its face that the proceeds of the IIT loan had financed at least in part the 1973 purchase by Great American of Raymond Colliery's stock.

119. The 1973 IIT loan closing binders clearly reflect that the IIT loans were made in connection with a transfer of control of the stock of Raymond Colliery and were made in large part to finance the purchase of the stock of the Raymond Group.

120. During the negotiations to purchase the IIT mortgages, James Tedesco did not have actual knowledge of the precise amount of the IIT loan proceeds which were paid to the prior owners of Raymond Colliery.

121. The index to the closing binders reflects that the binders included the June 30, 1973 financial statements of the Raymond Group.

122. Documents in the 1973 IIT loan closing binders clearly reflect that when the IIT loans were made the Raymond Group was having serious financial difficulties.

123. L. Robert Lieb had no knowledge that the Raymond Group was experiencing financial difficulties in November, 1973 or whether the Raymond Group was solvent in 1973.

124. The Raymond Group's difficulties with creditors during 1973 through 1976, including disputes with the Anthracite Health and Welfare Fund, injunction actions brought by creditors, and county tax sale notices of the Raymond Group's lands, were well publicized in the Wilkes-Barre and Scranton areas.

125. In December of 1976, Richard Bishop, counsel for Pagnotti Enterprises, reviewed the closing index from the 1973 transaction, the Note Purchase and Loan Agreement and at least some of the IIT mortgages on record in Lackawanna and Luzerne Counties.

126. The documents from the 1973 loan were complex and Richard Bishop expended much effort in attempting to understand the November 26, 1973 transaction.

127. The IIT mortgage documents were so complex that IIT loan administrators might not have been able to understand them.

128. James Tedesco relied upon the Chicago Title insurance policy issued in connection with the November 26, 1973 transaction at least in part in negotiating the purchase of the IIT mortgages.

129. The Chicago Title insurance policy on its face insured the IIT direct mortgages except against usury and claims under consumer credit laws.

130. The Chicago Title insurance policy made no reference to the enforceability of the guarantee mortgages.

131. L. Robert Lieb was not surprised that the guarantee mortgages were not covered by the title policy because title insurance companies do not ordinarily issue insurance for guarantee mortgages.

132. Morris Gelb concluded that a mortgage closed by Morgan, Lewis and Bockius, with a title insurance policy issued by Chicago Title Insurance Company and an opinion letter issued by Rosenn, Jenkins and Greenwald, would have little or no chance of being invalid.

133. Pagnotti Enterprises was primarily concerned with whether the IIT mortgages were first liens on the Raymond Group's assets and with the value of these assets.

134. James Tedesco determined that there was enough value in the Raymond Group assets to which the mortgages attached to pay both the principal and the interest on the IIT loans.

135. On December 15, 1976, IIT and James Tedesco on behalf of Pagnotti Enterprises signed a contract for the sale of the IIT loans and security interests to Pagnotti Enterprises or its nominee (hereinafter "the mortgage sale contract").

136. In 1976, James Tedesco had no independent knowledge of the current earnings of the Raymond Group.

137. Pagnotti Enterprises was not in the business of buying mortgages.

138. Pagnotti Enterprises entered into the mortgage sale contract with an intent to foreclose on the mortgages if third parties acquired the properties at the tax sale but with the intent not to foreclose if a nominee of Pagnotti Enterprises were the successful bidder at the tax sale.

139. James Tedesco hesitated in executing the IIT mortgage sale contract when he realized that he could not obtain "tax title" free and clear of liens to all of Blue Coal's coal lands because Lucky Strike Coal Company had paid the Luzerne County real estate taxes on the coal lands which it had under lease and, therefore, these lands were no longer scheduled to be sold at the tax sale.

140. The sale by IIT of its Raymond Group loans and security to Pagnotti Enterprises was understood by IIT and James Tedesco to be the vehicle for effecting a bargain purchase of the coal, surface lands, and other assets of the Raymond Group.

141. Pursuant to the mortgage sale contract, L. Robert Lieb was authorized by Pagnotti Enterprises and IIT to act as agent for both parties.

142. Upon executing the mortgage sale contract, James Tedesco, for Pagnotti Enterprises or its nominee, delivered to L. Robert Lieb as escrowee a $600,000 deposit.

143. Upon executing the mortgage sale contract, IIT delivered to L. Robert Lieb as escrowee a $600,000 deposit.

144. The escrowed funds were to be applied for the payment of delinquent real estate taxes on properties covered by the IIT mortgages, for the bidding in or on the properties covered by the mortgages, or for some combination thereof to be determined by Pagnotti Enterprises.

145. One objective of bidding at the tax sale was to put IIT and Pagnotti Enterprises in a more secure position vis-a-vis other creditors.

146. Once the IIT mortgage sale contract was executed, James Tedesco became the decisionmaker for purposes of determining what joint action would be taken by IIT and Pagnotti Enterprises at the county tax sales.

147. Pagnotti Enterprises and IIT inserted a provision in the mortgage sale contract of December 15, 1976 that the $600,000 deposit made by Pagnotti Enterprises would be forfeited should Pagnotti Enterprises refuse to complete the terms of the mortgage sale contract.

148. Pursuant to the terms of the mortgage sale contract, IIT represented to Pagnotti Enterprises that it had no knowledge of defenses to the IIT mortgage notes to be assigned to Pagnotti Enterprises or its nominee.

149. Pursuant to the terms of the mortgage sale contract, Pagnotti Enterprises agreed to pay all expenses incident to the county tax sales, including recording costs and preparation of tax deeds.

150. Pursuant to the terms of the mortgage sale contract, Pagnotti Enterprises agreed to reimburse IIT for all monies advanced by IIT and used either to pay delinquent real estate taxes or to bid in or on the properties at the tax sales.

151. Pursuant to the terms of the mortgage sale contract, IIT and Pagnotti Enterprises agreed that no commissions or brokerage fees for the sale of the mortgages would be payable by either party.

152. Pursuant to the terms of the mortgage sale contract, IIT and Pagnotti Enterprises agreed to undertake their best efforts to delay both of the tax sales scheduled for December 17, 1976, primarily to permit a thorough search of the tax records so as to determine on which lands to bid and the amounts of taxes actually owed on each parcel.

153. IIT abandoned its efforts to enjoin the county tax sales as a result of its execution of the contract to sell its mortgage debts to Pagnotti Enterprises.

154. Pagnotti Enterprises and IIT agreed that all bidding at the tax sale would be done in the name of a nominee corporation, the stock of which would be delivered to Pagnotti Enterprises or its nominee at the closing of the sale to Pagnotti Enterprises of the IIT loans and securities.

155. IIT and Pagnotti Enterprises agreed that the bidding would be done in the name of a nominee corporation in order to avoid the merger of the IIT mortgages and the tax sale titles.

156. On December 15, 1976, L. Robert Lieb formed two New Jersey corporations, Tabor Court Realty, Inc. and McClellan Realty Corporation.

157. Tabor Court Realty was formed to bid on Raymond Colliery's properties at the Lackawanna County tax sale and to take title to the same.

158. McClellan Realty was formed to bid on Blue Coal's properties at the Luzerne County tax sale and to take title to the same.

159. Pagnotti Enterprises developed a list of properties which it did not choose either to protect by payment of pre-1974

real estate taxes or to bid in or on at the tax sales.

160. James Tedesco decided which Raymond Colliery parcels would be bid upon at the tax sales.

161. Representatives of IIT and Pagnotti Enterprises had discussed the possibility that independent parties might bid at the scheduled county tax sales.

162. By letters dated December 16, 1976, Allen Katz, IIT's in-house counsel, requested that Lackawanna County Tax Claim Bureau and the Luzerne County Tax Claim Bureau, respectively, read to all prospective bidders at the tax sales that IIT, as of December 16, 1976, had a first mortgage of $4,731,895, plus additions thereto of $492,154, that notices of default had been issued, and that IIT as mortgagee might in its absolute discretion commence foreclosure proceedings.

163. It was apparent to IIT and Pagnotti Enterprises that the existence of the IIT mortgages would deter third parties from bidding on Raymond Colliery and Blue Coal parcels scheduled for tax sale.

164. L. Robert Lieb and James Tedesco decided to pre-pay the taxes that were superior to the IIT mortgages prior to the date of the tax sales so that the tax sales would not divest the IIT mortgages.

165. The pre-November 26, 1973 real estate taxes constituted a lien on the property purportedly encumbered by the IIT mortgages prior to said mortgages.

166. On December 16, 1976, from the $1,200,000 escrow account created as part of the December 15, 1976 mortgage sale contract, L. Robert Lieb, acting on behalf of IIT, paid $447,786.13 to Lackawanna County on account of delinquent real estate taxes owed by Raymond Colliery for years prior to 1974.

167. L. Robert Lieb also paid $30.00 on account of delinquent poor taxes levied against Raymond Colliery in 1930.

168. The payment of the pre-1974 realty taxes by IIT was an advance by IIT under a clause in the November 26, 1973 Note Purchase and Loan Agreement which gave it the right to pay delinquent taxes and add the amount paid to the lien of the mortgages.

169. The payment of $447,786.13 related to all properties formerly owned by Raymond Colliery and advertised for tax sale by Lackawanna County except those properties as to which Pagnotti Enterprises had determined no bid would be made at the tax sale.

170. Counsel for IIT and Pagnotti Enterprises met with a Lackawanna County Commissioner and James Mancuso, the Director of the Lackawanna County Tax Claim Bureau, to explain how much IIT would bid at the tax sale.

171. The officials of the Lackawanna County Tax Claim Bureau knew only the approximate amount of Raymond Colliery's pre-1974 Lackawanna County real estate tax liabilities.

172. On December 16, 1976, James Mancuso agreed to audit the amount of taxes due and refund any excess to Tabor Court Realty.

173. On December 16, 1976, L. Robert Lieb asked the Luzerne and Lackawanna County Tax Claim Bureaus to postpone the proposed tax sales without success.

174. The Lackawanna County tax sale began at 10:00 a.m. on December 17, 1976.

175. Norman Harris, local counsel for IIT, requested that the sale be adjourned until 3:30 p.m. on the ground that the principals involved in the sale also needed to attend a similar sale in Wilkes-Barre held by the Luzerne County Tax Claim Bureau scheduled for 10:00 a.m. the same day.

176. The Lackawanna County tax sale was adjourned until 3:30 p.m.

177. At the December 17, 1976 scheduled Luzerne County tax sale, John Doran, Esq., announced that, as counsel for four petitioning creditors, he had filed an involuntary bankruptcy petition against Blue Coal Corporation and accordingly, that the Luzerne County tax sale was stayed by operation of law.

178. In response to the statement set forth above, L. Robert Lieb stated that as counsel for McClellan Realty he was prepared to bid in the Blue Coal properties at the advertised upset price and that he objected to any stay of the Luzerne County tax sale.

179. Merton Jones, local counsel for IIT and McClellan Realty, and Allen Katz of IIT joined in L. Robert Lieb's objection.

180. As a consequence of the Blue Coal bankruptcy filing on December 16, 1976, the tax sale scheduled by the Luzerne County Tax Claim Bureau to be held on December 17, 1976 did not take place.

181. At 3:35 P.M. the Lackawanna County tax sale was reconvened.

182. By the time of the December 17, 1976 Lackawanna County tax sale, counsel for IIT and Pagnotti Enterprises were satisfied that they had sufficient information to bid on the properties at the tax sale.

183. Because of the confused nature of the Lackawanna County tax sale records and the probable failure of the county to post all of the properties of Raymond Colliery, counsel for IIT and Pagnotti Enterprises believed that the Lackawanna County tax sale would convey only color of title.

184. Prior to the bidding at the tax sale on Raymond Colliery's lands, Lackawanna County Solicitor James J. Ligi announced that IIT had a first mortgage on the tracts with a balance due of $4,731,895, plus additions of $44,368 and $447,786.13 for the taxes paid by IIT on December 16, 1976 and that IIT had paid all 1973 and earlier delinquent property taxes.

185. The announcement of the existence of the IIT mortgages at the Lackawanna County tax sale was made to suppress bidding on Raymond Colliery's lands and to prevent injury to a purchaser who bought property without knowledge of the liens as well as to prevent a subsequent attack upon the validity of the sale by such a purchaser because of such non-disclosure.

186. At the Lackawanna County tax sale, L. Robert Lieb on behalf of Tabor Court Realty submitted to the Lackawanna County Tax Claim Bureau a written bid for the aggregate upset sales price of the Raymond Colliery parcels, less the taxes allocable to certain coal-only properties for which no tender was made.

187. The written tax bid submitted by Tabor Court Realty stated that the bid was subject to audit of the Lackawanna County tax records, with any excess monies paid returnable to Tabor Court Realty and with any deficiency to be paid by Tabor Court Realty.

188. Mr. Ligi announced at the Lackawanna County tax sale that Tabor Court Realty had submitted a bid in the amount of the upset price which would be approximately $385,000 for the designated properties.

189. No other bids were made on any other Raymond Colliery lands at the tax sale.

190. Tabor Court Realty's bid of $385,000 was accepted by Lackawanna County and L. Robert Lieb tendered a check in that amount to James J. Ligi.

191. The check for $385,000 was drawn on the escrow account established pursuant to the terms of the December 15, 1976 mortgage sale contract.

192. Prior to the Lackawanna County tax sale, Norman Harris had prepared a tax sale deed covering the properties on which L. Robert Lieb intended to bid and had made arrangements with the county to have the deed executed immediately after the sale and to have the office of the Recorder of Deeds stay open past the usual closing time so that the deed could be recorded immediately after the tax sale.

193. Immediately following the 1976 tax sale, and on the same day, the deed prepared by Norman Harris purporting to convey the lands purchased by Tabor Court Realty was executed and delivered by the Lackawanna County Tax Claim Bureau, as grantor, to Tabor Court Realty.

194. The tax deed was recorded immediately thereafter.

195. IIT wanted the tax sale deed recorded as promptly as possible in order to

protect its interest in the event of an intervening bankruptcy proceeding.

196. James Tedesco and Hyman Green entered into an arrangement, the exact terms of which are not known to the Court, relating to the acquisition by Tabor Court Realty of the Raymond Colliery and Blue Coal properties at the 1976 tax sales.

197. As a result of this agreement, Hyman Green did not take any steps to protect Raymond Colliery's lands from being sold at the county tax sales.

198. Hyman Green did not attend either the Lackawanna or the Luzerne County tax sales.

199. L. Robert Lieb, counsel for IIT, avoided any discussion with James Tedesco regarding whether an arrangement had been made with Hyman Green because L. Robert Lieb did not want to be charged with such knowledge.

200. As of December 17, 1976, the stock of Tabor Court Realty was held by L. Robert Lieb as trustee under the terms of the December 15, 1976 mortgage sale contract.

201. On December 20, 1976, James Millard, as president of the four borrowers, forwarded to Pagnotti Enterprises acknowledged "declarations of no set-off."

202. After the 1976 tax sale, the Lackawanna County Tax Claim Bureau determined that Tabor Court Realty had made aggregate overpayments on the upset prices in the amount of $37,366 and refunded such sum to Tabor Court Realty.

203. The Lackawanna County Tax Claim Bureau also refunded to Tabor Court Realty the amounts of $1,455.00 and $116.00, which had been paid as duplicate purchase prices for parcels bought by Tabor Court Realty at the 1976 tax sale.

204. The $116.00 duplicate payment was allocable to the December 16, 1976 tax payment made by IIT to satisfy the delinquent taxes which pre-dated IIT's mortgages.

205. The checks for $37,366, $1,455 and $116 were made payable to Tabor Court Realty.

206. No refund of the 1930 poor tax was made although the tax was not a lien on the lands at the time of the sale.

207. In accordance with L. Robert Lieb's instructions, the three checks refunded to Tabor Court Realty by the Lackawanna County Tax Claim Bureau were sent to the post office box for Morris Gelb's firm, Gelb & Myers.

208. Neither the Lackawanna County Tax Claim Bureau nor IIT nor James Tedesco distinguished between the overpayment of the December 16, 1976, redemption payment and the December 17, 1976, tax sale bid by Tabor Court Realty.

209. The Lackawanna County tax deed was not amended to reflect the purported reduction of the sales price of Raymond Colliery's lands after the audit by the Lackawanna County Tax Claim Bureau.

210. None of the tax sale proceeds was paid to creditors whose liens were purportedly divested from the properties sold and none was paid to the holder of the mortgages.

211. The closing on the sale of the IIT mortgages to Pagnotti Enterprises or its nominee was scheduled for January 26, 1977.

212. Prior to and on the date of the January 26, 1977 closing, neither L. Robert Lieb nor James Tedesco had seen copies of the letters written in 1973 by Walter M. Strine, counsel for IIT, Bernard Jacobs, James Hillary, Charles Parente or Henry Greenwald to IIT concerning the details of the November 26, 1973 mortgage transaction.

213. Prior to and on the date of the January 26, 1977 closing neither James Tedesco nor L. Robert Lieb had seen the cash flow projections for the Raymond Group prepared in 1973 by John Streiker, the loan administrator at IIT involved with the 1973 mortgage transaction.

214. Prior to and on the date of January 26, 1977 closing of the mortgage sale contract L. Robert Lieb was unaware that Walter M. Strine had refused to furnish an opinion letter with respect to the "validity

and enforceability" of the IIT mortgages as required by the Note Purchase and Loan Agreement executed November 26, 1973.

215. It is not standard practice in the real estate field for a lender to waive the right to an opinion letter from its own counsel.

216. During the period of December 15, 1976, through January 26, 1977, Richard Bishop and Morris Gelb further reviewed the IIT closing documents of November 26, 1973.

217. Prior to and on January 26, 1977 closing of the mortgage sale contract, counsel for Pagnotti Enterprises, Morris Gelb and Richard Bishop, did not investigate the use made of the loan proceeds received by the Raymond Group in 1973.

218. The closing of the sale to Pagnotti Enterprises or its nominee of the IIT debt and securities was held as scheduled on January 26, 1977 at the offices of Nogi, O'Malley and Harris in Scranton.

219. Until the moment of closing L. Robert Lieb had doubts about whether Pagnotti Enterprises would complete the transaction even though it would have to forfeit its $600,000 deposit if the transaction were not closed.

220. At the January 26, 1977 closing Pagnotti Enterprises paid IIT $3,600,000 for IIT's loans and securities.

221. At the closing Pagnotti Enterprises reimbursed IIT for its $600,000 payment into the escrow account.

222. At the closing the IIT mortgages were assigned and delivered to McClellan Realty, the nominee of Pagnotti Enterprises.

223. At the closing Pagnotti Enterprises paid L. Robert Lieb $100.00 for the stock of McClellan Realty and the stock of McClellan Realty was transferred to Pagnotti Enterprises.

224. At the closing Morris Gelb paid L. Robert Lieb $100.00 for the stock of Tabor Court Realty and the stock of Tabor Court Realty was assigned to Loree Associates.

225. Loree Associates reimbursed Morris Gelb $100.00 for the payment for the stock of Tabor Court.

226. Loree Associates is a limited partnership owned 57.95% by individual members of the Pagnotti family, 22.05% by individual members of the Tedesco family and 20% by individual members of the Ventre family.

227. Louis Pagnotti, II, Sue Ventre and James Tedesco are general partners of Loree Associates. Children and grandchildren of Louis Pagnotti, Henry Ventre and James Tedesco are limited partners.

228. At the closing, L. Robert Lieb wrote a check to Pagnotti Enterprises for $299,412.00 which was the balance in the escrow account created on December 15, 1976.

229. At the closing, the remaining November 26, 1973 closing binders were delivered to Pagnotti Enterprises by Nogi, O'Malley and Harris, local counsel for IIT.

230. By January 26, 1977, Pagnotti Enterprises had paid a total of $4,500,688 for the purchase of the IIT mortgages and the stock of Tabor Court Realty.

231. On January 26, 1977, the balance purported to be due on the aggregate of the four IIT loans was $5,817,475.69.

232. Delinquent real estate taxes owed by Raymond Colliery to the City of Scranton for 1974, 1975, and 1976 were paid by McClellan Realty and not by the property owner, Tabor Court Realty.

233. McClellan Realty added the amount paid to the City of Scranton for Raymond Colliery's real estate taxes to the principal amount owed on the IIT loans.

234. McClellan Realty filed a proof of claim as a secured creditor of the Blue Coal bankruptcy estate for the aggregate principal balance and interest purported to be due on the November 26, 1973 IIT loans, based upon the guarantee mortgage executed by Blue Coal to secure the same.

235. At no time has Tabor Court Realty paid real estate taxes to Lackawanna County.

236. During the period of January 26, 1977 through December 16, 1980, Tabor Court Realty made no interest or principal payments on the mortgage loans.

237. During the period of January 26, 1977 through December 16, 1980, McClellan Realty did not request Tabor Court Realty to make any payments of interest or principal on the loans.

238. During the period of January 26, 1977 through December 16, 1980, McClellan Realty instituted no foreclosure proceedings as against the real properties purportedly owned by Tabor Court Realty.

239. During January 26, 1977 through December 16, 1980, neither McClellan Realty nor Tabor Court Realty had any business activity.

240. Lackawanna County personnel hindered the appraisers hired by the United States in connection with this litigation in their effort during 1980 to locate the properties sold at the 1976 tax sale.

241. Many, if not all, of the deeds issued by Raymond Colliery to purchasers in recent years had strip maps attached to them.

242. With the assistance of strip maps attached to the deeds, many, if not all, of the Raymond Colliery properties listed for tax sale in 1976 and identified in part or in whole by a function number could have been found by a qualified person conducting a title search.

243. In 1976, any competent title searcher exercising due diligence could have located all or substantially all of Raymond Colliery's lands advertised for tax sale by using the assessment records, grantors' and grantees' indices, aerial maps, and other maps and assessment records, all of which are public documents.

### III. Discussion.

#### A. Overview.

McClellan Realty and Pagnotti Enterprises claim that the IIT mortgages found fraudulent by this Court are valid in the hands of McClellan Realty. Pagnotti Enterprises, McClellan Realty's parent, was responsible for obtaining the assignment of the IIT mortgages to McClellan Realty. Therefore, Pagnotti Enterprises is the entity whose knowledge and actions are to be tested.

The United States, the Trustee in Bankruptcy and the Commonwealth (hereinafter the Creditors) have asserted two theories in support of their contention that the IIT mortgages are invalid in the hands of McClellan Realty. The first is that Pagnotti Enterprises was not a bona fide purchaser of the mortgages and therefore purchased the mortgages subject to all outstanding claims and defenses of third parties. See 39 Pa.Stat. § 359(1). The second is that the 1976 tax sale to Tabor Court Realty, the 1977 assignment of mortgages to McClellan Realty, and the transfers of stock of Tabor Court Realty and McClellan Realty to Pagnotti Enterprises and Loree Associates, two related entities, were made with an intent to hinder, delay or defraud creditors within the meaning of section 357 of the Pennsylvania Uniform Fraudulent Conveyance Act. 39 Pa.Stat. § 357.

#### B. Bona Fide Purchaser Issue.

■ Under the Pennsylvania Uniform Fraudulent Conveyance Act (hereinafter "the Act"), a creditor whose claim has matured may set aside any conveyance or obligation found fraudulent as against that creditor. 39 Pa.Stat. § 359(1). A subsequent purchaser of a fraudulent conveyance or obligation takes subject to the rights of creditors under the Act unless the subsequent purchaser is a "purchaser for fair consideration without knowledge of the fraud at the time of the purchase." 39 Pa.Stat. § 359(1). For simplicity, such a subsequent purchaser will be called herein a "bona fide purchaser". The burden of proof on this question rests on the alleged bona fide purchaser. *Cancilla v. Bondy,* 353 Pa. 249, 253, 44 A.2d 586 (1945).

■ Under the Act, Pagnotti Enterprises would attain the status of a bona fide purchaser only if it could establish both that it purchased the IIT mortgages for fair consideration and that it had no knowledge at

the time of the purchase that the IIT mortgages were fraudulent conveyances. 39 Pa. Stat. § 359(1).

Fair consideration is given for a property or an obligation when "in exchange for such property or obligation, as a fair equivalent therefor and in good faith, property is conveyed or an antecedent debt is satisfied. . . ." 39 Pa.Stat. § 353(a). The Defendants have argued that Pagnotti Enterprises paid IIT $4,500,588 for the IIT mortgages with a face value of $5,817,475.69. The $4,500,588 figure is the sum of $600,000 paid on December 15, 1976 by Pagnotti Enterprises into the escrow account under the mortgage sale contract, $3,600,000 paid by Pagnotti Enterprises at the January 26, 1977 closing of the mortgage sale contract, and $600,000 reimbursed by Pagnotti Enterprises to IIT at the January 26, 1977 closing for IIT's December 15, 1976 payment into the escrow account, less $299,412 refunded to Pagnotti Enterprises by L. Robert Lieb on January 26, 1977 as the balance remaining in the escrow account.

In our view, Pagnotti Enterprises paid $4,047,786.13 as consideration for the IIT mortgages. This figure is the sum of the $3,600,000 payment made by Pagnotti Enterprises to IIT on January 26, 1977 and the $447,786.13 payment from the escrow account of the pre-1974 delinquent real estate taxes of Raymond Colliery. Because the latter payment was necessary to protect the IIT mortgages from divestiture by the 1976 tax sale, it was part of the consideration paid for the mortgages. The remaining expenditures by Pagnotti Enterprises were for the purchase of the Raymond Colliery lands at the tax sale.

Despite their purported value of $5,817,-475.69, the IIT mortgages were in default and there was no probability, given the Blue Coal bankruptcy on December 16, 1976 and the dire financial condition of Raymond Colliery, that the mortgages would be paid in the near future. The $4,047,786 payment by Pagnotti Enterprises for the IIT mortgages was a fair equivalent of the value of those mortgages.

■ The second issue under Section 359(1) of the Act is whether Pagnotti Enterprises purchased the IIT mortgages with the knowledge that they were fraudulent conveyances. In order for a purchaser of a fraudulent conveyance to take free of the rights of creditors, he must have neither actual nor constructive notice of the rights of creditors in the property purchased. *Cancilla v. Bondy,* 353 Pa. at 253, 44 A.2d at 588; *United States v. West,* 299 F.Supp. 661 (D.Del.1969). Pagnotti Enterprises is charged with actual or constructive notice that the IIT mortgages were fraudulent conveyances under the Act only if Pagnotti Enterprises either knew or should have known (a) that the Raymond Group was rendered insolvent by the IIT mortgage obligations and that the IIT mortgages were not supported by fair consideration, 39 Pa. Stat. § 354, or (b) that the IIT mortgage obligations were undertaken at a time when the Raymond Group was engaged in a business for which the capital remaining in its hands was unreasonably small, 39 Pa.Stat. § 355, or (c) that the IIT mortgages were delivered at a time when the Raymond Group believed it would incur debts beyond its ability to pay as they matured, 39 Pa. Stat. § 356, or (d) that the IIT mortgages were entered into with an intent to hinder or delay creditors of the Raymond Group, 39 Pa.Stat. § 357.

We conclude that Pagnotti Enterprises either knew or should have known that the IIT mortgages were not supported by fair consideration and rendered the Raymond Group insolvent. There were sufficient facts known to Pagnotti Enterprises which would have alerted a reasonably prudent person to the likelihood that the IIT mortgages were defective and would thus have caused further investigation into the background of the IIT mortgages. *Davis v. Hudson Trust Co.,* 28 F.2d 740, 743–44 (3d Cir.1928). Moreover, a reasonable investigation would have revealed that the Raymond Group did not receive fair consideration for the IIT mortgages and was rendered insolvent by imposition of the same, thus making the IIT mortgages fraudulent

conveyances within the meaning of Section 354 of the Act.

There were numerous facts known to Pagnotti Enterprises which would have caused a reasonable person to act with care before purchasing the IIT mortgages. First, on September 15, 1976, the mortgage notes were declared in default by IIT, the balances thereon were accelerated and payment thereof was demanded. Second, on September 29, 1976 judgments were entered by IIT on the direct mortgages. Third, Pagnotti Enterprises was aware that the Raymond Group owed substantial overdue debts to the Internal Revenue Service, the Anthracite Health and Welfare Fund, the Commonwealth of Pennsylvania, and Lackawanna and Luzerne Counties. Indeed, the negotiations leading to the execution of the mortgage sale contract and the strategy used by Pagnotti Enterprises at the Lackawanna County tax sale were guided at least in part by the concern of IIT and Pagnotti Enterprises that creditors of Raymond Colliery and Blue Coal would force the corporations into bankruptcy before the tax sales could take place. Finally, by the time of the January 26, 1977 closing of the mortgage sale contract, Blue Coal had been placed into bankruptcy by its creditors.

The Creditors have argued that the above circumstances alone would prevent Pagnotti Enterprises from possessing the status of a bona fide purchaser of the mortgages or at least would have put Pagnotti Enterprises on notice to make inquiry into the validity of the mortgages. There is modest support for this position. *See Jones on Mortgages* § 1069 (8th Ed.) (which states that an assignee of a mortgage is not protected against equities of a third person if the assignment was taken after maturity of the debt secured). *See also Fuetsch v. Fahney,* 233 Wis. 34, 287 N.W. 687 (1939); *Hulet v. Denison,* 146 Fla. 478, 1 So.2d 467 (1941). *Cf.,* 3 Williston, *A Treatise on the Law of Contracts* § 438 at 259–60 (3d Ed.1960) (the fact that a negotiable instrument is overdue does not give rise to constructive knowledge of the existence of collateral equities affecting the transferor's title); *In re Locust Building Co., Inc.,* 299 F. 756, 762 (2d Cir.

1924). However, because Pagnotti Enterprises knew additional facts which more clearly related to the defects in the IIT mortgages, we need not decide whether the bankruptcy of Blue Coal, the default status of the mortgages and the obvious insolvency of the Raymond Group on December 15, 1976 and January 26, 1977 are suspicious circumstances sufficient to deprive Pagnotti Enterprises of the status of a bona fide purchaser and to put Pagnotti Enterprises on notice to inquire into the validity of the IIT mortgages.

Pagnotti Enterprises knew that some portion of the IIT loan proceeds were used to pay the prior shareholders of Raymond Colliery for their stock. We reach this conclusion for several reasons. First, the index to the IIT loan closing documents which was provided to Pagnotti Enterprises on October 20, 1976 and which was reviewed by representatives and officers of Pagnotti Enterprises shows on its face that the November 26, 1973 IIT loan was used in part for the purchase of the stock of the Raymond Group. The precise language of the index to Volume XII at item 1.22(n) is as follows: "Disclosure of the sources of all financings of the purchase price not being funded by IIT..."

Second, by October of 1976, if not earlier, James Tedesco knew that on November 26, 1973 the Raymond Group had become obligated for $8,530,000 to IIT by mortgages of record. Third, James Tedesco, an officer of Pagnotti Enterprises was also aware, at least as of January, 1974, two months after the closing of the IIT loans, that the Raymond Group was having serious financial difficulties and was attempting to liquidate its assets. In our view, the knowledge of these facts by Pagnotti Enterprises would certainly have put it on notice to inquire into the use of the substantial monies purportedly received by the Raymond Group from IIT. This information alone put Pagnotti Enterprises on notice that the Raymond Group may not actually have received the proceeds of the IIT mortgages and, therefore, that the mortgages may not have been supported by fair consideration.

■ Once a subsequent purchaser of a mortgage is put on notice to inquire into a certain fact, he will be charged with all additional facts which a reasonably diligent inquiry would have disclosed. *Davis v. Hudson Trust Co.,* 28 F.2d 740, 743–44 (3d Cir.1928). In this case, reasonable inquiry would have revealed that substantial portions of the IIT loan proceeds did not pass to the Raymond Group but were funneled through the Raymond Group to the sellers of the Raymond Colliery stock. In particular, the index to the closing documents which was in the possession of Pagnotti Enterprises referred to a document listed as "Letter to Chicago Title Insurance Company (November 27, 1973) *re: application of loan proceeds* " (emphasis added) and to the location of this document in the closing binders. The contents of the closing binders were either in the possession of or readily available to Pagnotti Enterprises shortly after October 20, 1976 and before January 26, 1977. The "Letter to Chicago Title Insurance Company" was prepared by counsel for IIT, signed by James J. Durkin on November 27, 1973, and states that substantial portions of the IIT loan proceeds were disbursed by the mortgagors to Great American for purchase of the stock of Raymond Colliery. This document clearly shows that the Raymond Group did not receive fair consideration for the IIT obligations it undertook. This is one prong of the Section 354 test.

Moreover, a review of the index to the closing binders would have readily revealed to Pagnotti Enterprises that they contained the financial statements of all members of the Raymond Group between 1971 and June 30, 1973. These financial statements show that the Raymond Group had substantial liabilities, a poor earnings history and would have been unable to meet the IIT loan obligation. *See United States v. Gleneagles,* 565 F.Supp. at 564–65, 572, 578. Having this knowledge, Pagnotti Enterprises would have ascertained that the Raymond Group was rendered insolvent by the IIT loans. Thus, the dual requirements of Section 354 are met, that the IIT mortgages were not supported by fair consideration and that the Raymond Group was rendered insolvent by the IIT mortgage obligations. Further, even assuming the financial statements themselves were not dispositive of the question of whether the Raymond Group was rendered insolvent by the IIT mortgages, they surely demonstrated the bleak nature of the Raymond Group's financial position in 1973 and the necessity for a further investigation by a purchaser of IIT's mortgages of the Raymond Group's solvency on November 26, 1973.

■ For the same reasons, we are of the view that Pagnotti Enterprises should have known that the mortgages were executed by the Raymond Group at a time when the Raymond Group was engaged in a business for which the property remaining in its hands was an unreasonably small capital and thus fraudulent within the meaning of 39 Pa.Stat. § 355. *See United States of America v. Gleneagles,* 565 F.Supp. at 580 (finding of insolvency is *ipso facto* a finding that the debtor was left with unreasonably small capital after the conveyance).

■ The Defendants have argued that they were not on notice to inquire into the adequacy of the consideration received by or the solvency of the Raymond Group because the various documents assigned or obtained as part of the January 26, 1977 mortgages acquisition assured them that the IIT mortgages were valid. The Defendants point first to the fact that they obtained "Declarations of No Set-Off" from the debtors prior to purchasing the IIT mortgages. The declarations of no set-off would only protect Pagnotti Enterprises from defenses to the mortgages raised by the corporate debtors. *Quigley v. Breyer Corp.,* 362 Pa. 139, 142, 66 A.2d 286, 287 (1949); *Fort Pitt Real Estate Co. v. Schaefer,* 96 Pa.Super. 497, 502 (1929).

Obtaining those declarations, therefore, did not eliminate the need to inquire further into the existence of equities in favor of other creditors of the Raymond Group. Moreover, we find it exceedingly odd that one of the declarations of no set-off was signed by James Millard as president of

Blue Coal on December 20, 1976 which was after the filing of the Blue Coal bankruptcy petition. Pagnotti Enterprises could not reasonably rely on a declaration of no set-off executed by a president of a company against which an involuntary bankruptcy petition has been filed.

■ Defendants also point to the fact that the mortgages were covered by title insurance. The Defendants argue that the existence of a title insurance policy excuses them from any requirement that they inquire into the validity of the mortgages except as to those matters excluded by the policy. This is a paralogism. The first defect in the Defendants' argument is that the title insurance policy did not cover the guarantee mortgages. Therefore, the policy could not reasonably be relied upon as evidence of the validity of the guarantee mortgages.

A review of the materials in the closing binders relating to the title insurance policy would have led Pagnotti Enterprises to the letter of November 27, 1973 signed by James Durkin to Chicago Title on the use of the IIT loan proceeds. The letter was prepared by counsel for IIT to inform Chicago Title of a potential defect in the mortgages to guard against a clause in the policy excluding from coverage "[d]efects, . . . or other matters . . . not known to [Chicago Title] and not shown by the public records but known to the insured claimant and not disclosed in writing . . . to [Chicago Title]." This letter was notice to Chicago Title, and later to Pagnotti Enterprises, that the use of the IIT loan proceeds in the purchase of the stock of the Raymond Group made the mortgages potentially defective.

The Court questions the Defendants' assertion that Pagnotti Enterprises did not have actual knowledge of certain matters which would have led its officers to conclude that the IIT mortgages rendered the Raymond Group insolvent and that fair consideration was not received by the Raymond Group for the mortgages. In particular, representatives of Pagnotti Enterprises, during the course of this trial, repeatedly asserted that they relied primarily on the Chicago Title insurance policy when negotiating to purchase the IIT debts and securities. In our view, such a reliance would at a minimum have caused Pagnotti Enterprises to review every document listed in the closing index relating to the title insurance policy. Only two such documents were listed in the index—the policy itself and the "Letter to Chicago Title Insurance Company" from James Durkin. In our opinion, this latter document was likely read by representatives of Pagnotti Enterprises sometime before the January 26, 1977 closing of the mortgage sale contract and the reader was informed that the Raymond Group did not receive fair consideration for the IIT mortgage obligation.

Additionally, Pagnotti Enterprises, through its various coal producing affiliates, was the Raymond Group's largest competitor in the anthracite coal market and the two competitors dominated the market. The financial statements of the Raymond Group were contained in the 1973 closing binders and were properly indexed. Tedesco should have examined these financial statements. Further, Tedesco's knowledge of Durkin's activities in early 1974 relating to the sale of substantial assets of the Raymond Group would have alerted him to the fact that the apparent massive infusion of capital in November, 1973 had not produced financially healthy mortgagors but had caused, instead, unhealthy, insolvent debtors. Companies related to Pagnotti Enterprises lent under the direction of Tedesco $405,000 to the Durkins or to Great American Coal to assist in financing Great American's purchase of stock of Raymond Colliery. Moreover, on at least two occasions prior to the closing of the IIT loans, counsel for the Durkins, Henry Greenwald, sought from James Tedesco information needed by James Durkin for the closing of the IIT loan.

An additional fact in this case which indicates an unusually close relationship between the Durkins and James Tedesco is the suspicious "loan" of $200,000 made on July 16, 1973 by No. 1 Contracting Co. to James and Anna Jean Durkin and exces-

sively secured by $300,000 in cash. Tedesco admitted that this transaction was unique, that No. 1 Contracting had not made other loans, and that he had never heard of any other "loan" secured 150% by cash. The cash collateral was kept in a safe deposit box for over two years. James Tedesco allegedly accepted the cash collateral without questioning James Durkin as to its origin. There was certainly no economic reason behind the willingness of James Durkin and Pagnotti Enterprises to secrete the cash in this unprofitable manner for over two years. Further, we find it exceedingly odd that the Old Forge Bank at the instance of James Tedesco made an unsecured loan to the Durkins on the same date that No. 1 Contracting also through the offices of James Tedesco made the loan excessively secured by cash to the Durkins. James Tedesco testified that he made the $200,000 loan by No. 1 Contracting Co. because he saw an opportunity to earn for the company interest thereon. If that was his motive, why then did he not put the $300,000 collateral at interest at least in negotiable short term U.S. governmental bonds where the risk could fairly be dismissed as negligible? No satisfactory explanation of this unique "loan" was given to the Court and we are not convinced that a full disclosure of the circumstances of the "loan" was made to the Court by Tedesco although directly requested of Tedesco by the Court while he was on the stand. This "loan" is neither fish nor fowl nor good red herring.

During the course of these various contacts and given the natural curiosity one would have regarding the specifics of a sale of the stock of one's major competitor, we find incredible that representatives of Pagnotti Enterprises when dealing in 1973 with Durkin or his counsel did not request and receive information relating to the IIT financing. In short, we are not convinced that Pagnotti Enterprises did not have actual knowledge of the basic structure of the IIT mortgage transaction and its potentially defective nature.

■ Defendants contend that Pagnotti Enterprises became a purchaser of the IIT mortgages upon signing the December 15, 1976 mortgage sale contract and was not put on notice to inquire as to the validity of the mortgages until after that date. On December 15, 1976, it paid only $600,000 which would have been insufficient to make it a bona fide purchaser of the IIT mortgages having a face amount of $5,817,475.69. See 39 Pa.Stat. § 353(a). Moreover, while we have found no Pennsylvania case on point, the law in other jurisdictions is that an individual is not a purchaser of a property until he has actually paid the purchase price or has become irrevocably bound to make payment therefor. E.g., 37 Am. Jur.2d, Fraudulent Conveyances, § 154. The signing by Pagnotti Enterprises of the mortgage sale contract on December 15, 1976 did not irrevocably bind Pagnotti Enterprises to purchase the IIT mortgages. IIT would have been unable under the mortgage sale contract to obtain specific performance if Pagnotti Enterprises had failed to perform because the contract provided for liquidated damages in the amount of $600,000 in the event that Pagnotti Enterprises failed to purchase the mortgages. Pagnotti Enterprises did not become a purchaser of the IIT mortgages until January 26, 1977 when it paid the balance of the purchase price and was clearly put on notice prior to that date to inquire as to all the matters heretofore considered.

■ For all the foregoing reasons, we are of the view that Pagnotti Enterprises was not a "purchaser for fair consideration without knowledge" of the fact that the IIT mortgages were fraudulent conveyances within the meaning of Sections 354 and 355 of the Act at the time it purchased them. 39 Pa.Stat. § 359(1). While we have concluded that Pagnotti Enterprises either knew or should have known that the IIT mortgages were fraudulent within the meaning of Sections 354 and 355 of the Act, we believe Pagnotti Enterprises neither knew or should have known that the IIT mortgage obligation was incurred at a time when the Raymond Group believed it would incur debts beyond its ability to repay as they matured. 39 Pa.Stat. § 356. In this

Court's earlier opinion, we concluded the IIT mortgages were fraudulent within the meaning of Section 356 of the Act in part because James Durkin, the president of the Raymond Group, knew that the IIT mortgages and the burdensome provisions in the Note Purchase and Loan Agreement relating to the required principal payments of proceeds from the sale of surplus lands would render the Raymond Group unable to pay debts arising in the ordinary course of its business. The intentions of James Durkin on November 26, 1973 and all of the information he had when he purchased the stock of Raymond Colliery were probably not known to Pagnotti Enterprises on January 26, 1977, nor were there any facts known to Pagnotti Enterprises which would have led it further to investigate in an attempt to determine the actual intent of James Durkin on November 26, 1973. Therefore, Pagnotti Enterprises neither knew nor should have known that the IIT mortgages were fraudulent within the meaning of Section 356 of the Uniform Fraudulent Conveyance Act.

■ We further conclude that Pagnotti Enterprises neither knew nor should have known that the IIT mortgages were delivered with an intent to hinder or delay the Raymond Group's many creditors within the meaning of Section 357 of the Act. The Court, in its earlier opinion, concluded that IIT and the Raymond Group were aware that the 1973 transaction was not supported by fair consideration and that they were aware that, as a result of the IIT mortgages, the Raymond Group would be unable to meet its other very substantial financial obligations. The Court further concluded, based on the knowledge of these matters possessed by IIT and the Raymond Group, that they intended to hinder and delay the collection efforts of the Raymond Group's numerous and very substantial unsecured creditors. The Court therefore determined that the IIT mortgages were fraudulent within the meaning of Section 357 of the Act.

However, all the documentation and facts which led the Court to reach these conclu-

sions were not in the possession of Pagnotti Enterprises when it purchased the mortgages. Much of the documentation consisted of correspondence from IIT's counsel and a cash flow chart for Blue Coal drafted by a loan administrator at IIT contained in filing cabinets at IIT's New York offices. While the contents of these cabinets were available for review by Pagnotti Enterprises, Pagnotti Enterprises had no reason to review these voluminous documents for evidence of an intent on the part of IIT to hinder or delay Raymond Group creditors and did not act unreasonably in failing to do so. We conclude, therefore, that Pagnotti Enterprises neither knew nor should have known that the IIT mortgages were delivered with an intent to hinder or delay the creditors of the Raymond Group in violation of 39 Pa.Stat. § 357.

### C. Fraudulent Conveyance Theory.

■ The Creditors also assert that the scheme embodied in the December 15, 1976 mortgage sale contract whereby the lands of Raymond Colliery were permitted to be sold at the 1976 Lackawanna County tax sale to Tabor Court Realty, the IIT mortgages were sold to McClellan Realty, and the stock of both Tabor Court Realty and McClellan Realty were sold to related entities of Pagnotti Enterprises was a fraudulent conveyance within the meaning of Section 357 of the Pennsylvania Uniform Fraudulent Conveyance Act. 39 Pa.Stat. § 357. Section 357 of the Act provides: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors."

We have no doubt that the strategy agreed upon by Pagnotti Enterprises and IIT embodied in the December 15, 1976 mortgage sale contract was to obtain the lands of Raymond Colliery and Blue Coal free and clear of the claims of other creditors. In addition, Pagnotti Enterprises and IIT were aware that, by permitting Raymond Colliery and Blue Coal lands to be

sold at county tax sale, these companies would be stripped of their most valuable assets and their creditors would be left without any possibility of payment. Nonetheless, we are not convinced that the intentional fraud provisions in the Uniform Fraudulent Conveyances Act cover situations where persons act to hinder the collection efforts of creditors of third parties. Furthermore, in our view, IIT and Pagnotti Enterprises simply took advantage of the Pennsylvania law relating to the effect of county tax sales. While the liens of other creditors were purportedly discharged from Raymond Colliery's lands by the 1976 Lackawanna County tax sale and while Raymond Colliery was impoverished to the detriment of its many creditors, neither IIT nor Pagnotti Enterprises had any obligation to protect other creditors by enjoining the tax sales or failing to participate in the Lackawanna County sale. *David Oil Co. v. Fogle,* 354 Pa. 150, 153, 47 A.2d 209, 210 (1946).

The United States has cited several cases which indicate that use of a tax sale to commit a fraud on one's creditors is an intentional fraud within the meaning of the Uniform Fraudulent Conveyance Act. *See Smart v. Baroni,* 360 Pa. 296, 61 A.2d 860 (1948); *Pepe v. Mildred Bean,* 14 Fay.Leg. 133 (1951); *Roeting v. County of Lancaster,* 42 Pa.Cmwlth. 315, 401 A.2d 580 (1979). However, all cases cited by the United States involve situations where the debtor itself conspired with another party to use a foreclosure sale or tax sale to sell the property and discharge other liens. In this case, while there was some hint in the evidence that Pagnotti Enterprises was conspiring with Hyman Green to use the Luzerne and Lackawanna tax sales to put the lands of Raymond Colliery and Blue Coal in the hands of Pagnotti Enterprises at a bargain price, and while it is extremely odd that Green did not appear at the tax sale and simply vanished without any payment, the existence of this conspiracy has not been proven by clear and convincing evidence. *Finberg v. Burkhardt,* 239 Pa. 519, 86 A. 1062 (1913). *Cloud v. Markle,* 186 Pa. 614, 40 A. 811 (1898); *Miners Savings Bank of*

*Pittston v. United States,* 110 F.Supp. 563, 568 (M.D.Pa.1953). We therefore decline to determine that the actions of Pagnotti Enterprises relating to the December 15, 1976 mortgage sale contract constitute intentional fraud within the meaning of Section 357 of the Act.

### IV. Conclusions of Law.

1. The Lackawanna and Luzerne County real estate taxes which pre-dated the November 26, 1973 IIT mortgages constituted a prior lien on the lands of the Raymond Group.

2. Pagnotti Enterprises, on January 26, 1977, was not a purchaser for fair consideration without knowledge that the IIT mortgages were fraudulent conveyances under 39 Pa.Stat. §§ 354 and 355.

3. The Lackawanna County tax sale of lands of Raymond Colliery on December 17, 1976 and the subsequent tax deed was wholly defective and did not transfer title to said lands to Tabor Court Realty.

4. The Lackawanna County tax sale of the lands of Raymond Colliery on December 16, 1980 and the subsequent tax deed was wholly defective and did not transfer title to said lands to Gleneagles Investment Co., Inc.

An appropriate order in accordance with this opinion will be entered in due course after the conclusion of the trial.