UNITED STATES of America, Plaintiff,

v.

GLENEAGLES INVESTMENT CO.,
INC., et al., Defendants.

Civ. No. 80–1424.

United States District Court,
M.D. Pennsylvania.

April 10, 1984.

As Corrected May 16, 1984.

Beth A. Kaswan, Tax Div., U.S. Dept. of Justice, Washington, D.C., for Dept. of Justice.

D. Alan Harris, Sp. Deputy Atty. Gen., Chicago, Ill., for Com. of Pa.

Robert C. Nowalis, Doran & Nowalis, Wilkes-Barre, Pa., for trustee.

Eugene J. Wien, Philadelphia, Pa., for I.R.S.

Joseph Solfanelli, Dolphin, Solfanelli & Butler, Scranton, Pa., for Gleneagles Inv.

Thomas G. Bailey, Jr., David Allen Koenigsberg, Whitman & Ransom, New York City, for Pagnotti Enterprises.

Robert J. Rosenberg, New York City, for Pagnotti defendants.

David E. Lehman, McNees, Wallace & Nurick, Harrisburg, Pa., for Gillens and Clevelands.

Gilbert B. Abramson, Abramson, Freedman & Blackman, P.C., Philadelphia, Pa., for Gillens.

## OPINION

MUIR, District Judge.

### I. Introduction.

The United States has sought in this litigation to set aside as fraudulent conveyances mortgages on the lands of Raymond Colliery (hereinafter the IIT mortgages) and to foreclose on tax liens against Raymond Colliery and its parent, Great American Coal Company, free and clear of the IIT mortgages. Those mortgages were delivered by Raymond Colliery on November 26, 1973 to Institutional Investors Trust (IIT) and assigned by IIT onto Defendant McClellan Realty. The United States has also sought in this lawsuit to set aside the 1976 and 1980 tax sales of the lands of Raymond Colliery by Defendant Lackawanna County.

Blue Coal and Glen Nan are bankrupt subsidiaries of Raymond Colliery and their assets are also encumbered by the IIT mortgages. (Raymond Colliery and its subsidiaries will be called hereinafter "the Raymond Group"). The Defendant Trustee in Bankruptcy for Blue Coal and Glen Nan filed a cross-claim in which he sought, *inter alia*, to set aside the IIT mortgages. The United States and the Trustee will be hereinafter called "the Creditors." The Defendant Commonwealth of Pennsylvania is not within the group classed as Creditors because it filed no cross-claim but it is a creditor of Raymond Colliery and has participated in this litigation as though it were a cross-claim plaintiff.

This lawsuit has been the subject of two earlier opinions by the Court. In the first opinion, the Court concluded that the IIT mortgages were fraudulent conveyances within the meaning of §§ 354, 355, 356, and 357 of the Pennsylvania Uniform Fraudulent Conveyance Act, 39 Pa.Stat. § 351, *et seq* (hereinafter sometimes referred to as "the Act"). *United States v. Gleneagles Inv. Co., Inc.*, 565 F.Supp. 556, 585–86 (M.D.Pa.1983) (hereinafter *Gleneagles I.*) In the second opinion, the Court concluded that Pagnotti Enterprises which purchased the IIT mortgages and caused the assignment thereof to its subsidiary, McClellan Realty, was not a purchaser of the IIT mortgages for fair consideration without knowledge that they were fraudulent conveyances. *United States v. Gleneagles Inv. Co., Inc.*, 571 F.Supp. 935, 958 (M.D. Pa.1983) (hereinafter *Gleneagles II*). We also concluded in *Gleneagles II* that the Lackawanna County tax sales of the lands of Raymond Colliery in 1976 and 1980 and the consequent tax deeds were void and ineffective to transfer title to the purchasers at those tax sales. *Id.*

The Creditors also asserted claims against the Gillen and Cleveland Defendants, former shareholders of Raymond Colliery who were found liable in *Gleneagles I.* After that finding, the United States, the Trustee and the Commonwealth of Pennsylvania entered into settlement agreements with the Gillen and Cleveland Defendants relating to this and other litigation. Under those settlements the Cleve-

land Defendants paid $5,500,000 and the Gillen Defendants paid $600,000 in satisfaction of all claims asserted against them in this litigation and the other litigation. The Court dismissed the Gillen and Cleveland Defendants as parties to this lawsuit pursuant to those settlement agreements.

Below are the Court's findings of fact, opinion and conclusions of law with respect to the priority and validity of liens on the lands of Raymond Colliery.

## II. Findings of Fact.

1–167. The findings of fact in *Gleneagles I* are incorporated herein by reference.

168–410. The findings of fact in *Gleneagles II* are incorporated herein by reference.

411. On November 26, 1973, Thomas Gillen received $1,675,000 from Great American Coal and a note payable to his order by the Raymond Group for $125,000 in payment for his stock in Raymond Colliery.

412. On November 26, 1973, John Gillen received $1,675,000 from Great American and a note payable to his order by the Raymond Group for $125,000 in payment for his stock in Raymond Colliery.

413. On November 26, 1973, the Cleveland group of shareholders received $3,350,000 from Great American and notes payable to their order by the Raymond Group for $250,000 in payment for their stock in Raymond Colliery.

414. Judgments were confessed on the notes described in Paragraphs 411, 412, and 413 on June 16, 1975.

415. No. 1 Contracting Company and Old Forge Bank lent money to James J. Durkin to assist him in acquiring the stock of Raymond Colliery and these loans were the only loans from third parties for such purpose which were not disclosed by Durkin to IIT in connection with his loan application to IIT.

416. During the period from November 26, 1973 through April, 1976, the financial condition of the Raymond Group worsened.

417. During the period from November 26, 1973 through April, 1976, Raymond Colliery, Blue Coal, Olyphant Associates, and Glen Nan paid to IIT a total of $4,589,640 in principal and interest on the IIT mortgages.

418. On December 16, 1976, L. Robert Lieb on behalf of IIT paid to the Commonwealth of Pennsylvania $44,368.74 in delinquent taxes owed by Raymond Colliery.

419. On December 16, 1976, L. Robert Lieb on behalf of IIT paid to the City of Scranton $11,122.25 in delinquent real estate taxes owed by Raymond Colliery for years prior to 1974.

420. In April, 1977, McClellan Realty paid $23,179.36 to the City of Scranton for delinquent real estate taxes due from Raymond Colliery for the years 1974, 1975 and 1976.

421. The above payment by McClellan Realty was added to the lien of the IIT mortgages.

422. On December 12, 1977, Joseph Solfanelli hand-delivered to Hyman Green a notice that McClellan Realty intended to sell at one or more private sales held on or after February 12, 1978 the following collateral given by the debtors to secure the IIT loans:

 a. the capital stock of Great American Coal Co.

 b. the capital stock of Raymond Colliery

 c. accounts

 d. contract rights

 e. general intangibles

 f. goods

 g. inventory

 h. equipment

 i. culm

 j. silt

 k. refuse banks

 l. the contract rights described in the assignments of leases, operating and distribution agreements, and

 m. the contract rights under a November 26, 1973 agreement with Susquehanna Coal Co.

423. McClellan Realty foreclosed on its security interest in Raymond Colliery's equipment, culm, silt, contract rights, accounts, and other personalty in a private sale conducted on or about February 28, 1978 and bought in the same.

424. On or about February 28, 1978, James Tedesco, on behalf of McClellan Realty, and Louis Pagnotti, on behalf of Loree Associates, executed a contract whereby McClellan Realty purported to sell all the assets described in Paragraph 422(c) through (k) to Loree Associates for $50,000.

425. No schedule of the specific assets purported to be sold to Loree Associates was prepared.

426. The assets purported to be foreclosed upon and sold by McClellan Realty to Loree Associates were not advertised for sale.

427. The assets purported to be foreclosed upon and sold by McClellan Realty to Loree Associates were not offered for sale to any person or entity not affiliated with Pagnotti Enterprises.

428. The purported sale and purchase of the equipment and other assets was not recorded on the books of Loree Associates or McClellan Realty until May, 1983 which was six months after the start of this trial.

429. To record the $50,000 payment from Loree Associates, McClellan Realty credited the IIT loan principal balance with $50,000 and Tabor Court increased its liabilities by $50,000, presumably to Loree Associates.

430. The stock of Raymond Colliery was foreclosed upon by McClellan Realty and sold for $1.00 at a private sale on October 6, 1978 to Joseph Solfanelli as Trustee for the Pagnotti Group.

431. In each of the aforesaid foreclosure sales McClellan Realty bid in the collateral in its own name or the name of its nominee, Joseph R. Solfanelli.

432. McClellan Realty did not give notice of the proposed private sale to the Trustee in Bankruptcy for Blue Coal, one of the debtors to McClellan Realty, or to any of the guarantors of Raymond Colliery's debt.

433. The only person or entity given notice of the private sales was Hyman Green.

434. McClellan Realty did not secure appraisals for any of the collateral which it sold at the private sales.

435. On December 16, 1980, a second tax sale of the lands of Raymond Colliery was held by the Lackawanna County Tax Claim Bureau.

436. At the December 16, 1980, tax sale Joseph Solfanelli, acting on behalf of Gleneagles Investment Co. (hereafter Gleneagles), a corporation yet to be formed, and others successfully bid on the lands of Raymond Colliery.

437. Solfanelli tendered to the Lackawanna County Tax Claim Bureau his personal check in the amount of $612,239.56 in payment of the bid price.

438. Solfanelli bid $5,394.09 more than the advertised upset bid price.

439. On January 8, 1981, Gleneagles was incorporated under Pennsylvania law with Joseph Solfanelli as the sole shareholder.

440. On January 23, 1981, the Lackawanna County Tax Claim Bureau returned to Solfanelli his personal check for $612,239.56 and accepted Gleneagles' check in the amount of $535,290.39 in its stead.

441. In connection with the 1980 tax sale, Gleneagles also paid 1980 school taxes to the Lackawanna County Tax Claim Bureau in the amount of $93,935.04.

442. The lands of Raymond Colliery were purportedly transferred directly to Gleneagles by the Lackawanna County Commissioners by deed of April 15, 1981.

443. Officers and agents of the Pagnotti Defendants were also agents and controlling stockholders of Raymond Colliery and at least one officer of Raymond Colliery was also an agent of the Pagnotti Defendants at the time of the Lackawanna County 1980 tax sale.

444. The officers and agents of the Pagnotti Defendants who were at that time agents and controlling stockholders of Raymond Colliery did not act in good faith with reference to the creditors of Raymond Colliery when they attempted to divest the creditors' liens by running the lands of Raymond Colliery through the Lackawanna County 1980 tax sale.

445. The Lackawanna County Tax Claim Bureau return to the Court of Common Pleas of Lackawanna County stated that Gleneagles had purchased the Tabor Court properties for $629,225.43, the total of the two Gleneagles payments described in paragraphs 440 and 441.

446. On or about June 23, 1981, Joseph Solfanelli, on behalf of Gleneagles, paid to the Lackawanna County Tax Claim Bureau the $5,394.09 described in Paragraph 438.

447. The Commonwealth of Pennsylvania holds liens on the lands of Raymond Colliery reflecting unpaid corporate taxes owed by Raymond Colliery in the following amounts:

| Fiscal Year Ending | Tax | Interest to 6/30/83 | Total due 6/30/83 |
|---|---|---|---|
| 6/30/69 | $18,085.00 | $14,873.00 | $32,958.00 |
| 6/30/70 | 19,223.00 | 14,655.00 | 33,878.00 |
| 6/30/71 | 16,038.00 | 11,265.00 | 27,303.00 |
| 6/30/72 | 36,542.00 | 23,475.00 | 60,017.00 |
| 6/30/74 | 1,738.00 | 907.00 | 2,645.00 |
| 6/30/75 | 30,131.00 | 13,928.00 | 44,059.00 |
| 6/30/75 | 410,381.00 | 189,701.00 | 600,082.00 |
| 6/30/75 | 17,343.00 | 8,017.00 | 25,360.00 |
| 6/30/76 | 193,242.00 | 77,264.00 | 270,506.00 |
| 6/30/77 | 193,242.00 | 65,739.00 | 258,981.00 |
| 6/30/78 | 193,242.00 | 54,496.00 | 247,738.00 |
| 6/30/79 | 193,242.00 | 42,911.00 | 236,153.00 |
| 6/30/80 | 217,982.00 | 35,138.00 | 253,120.00 |
| Totals | $1,540,431.00 | $552,369.00 | $2,092,800.00 |

448. The Commonwealth tax lien for fiscal year ending June 30, 1974 in the principal amount of $1,738.00 and the tax liens for fiscal year ending June 30, 1975, in the principal amounts of $30,131.00 and $410,-381.00 were filed between April 13, 1976 and January 27, 1977.

449. The remaining Commonwealth tax liens were filed on June 11, 1982 and July 12, 1983.

450. Raymond Colliery filed tax returns with the Commonwealth for the fiscal years ending June 30, 1969 through June 30, 1975.

451. No corporate tax returns were filed by Raymond Colliery with the Commonwealth for the fiscal years ending June 30, 1976 through June 30, 1980.

452. On June 11, 1982, the Commonwealth made estimated settlements of corporate taxes owing from Raymond Colliery for fiscal years ending June 30, 1976 through June 30, 1980.

453. The estimated settlements described in the preceding paragraph were reviewed for substantive accuracy by both the Commonwealth of Pennsylvania Department of Revenue and Department of the Auditor General.

454. Raymond Colliery sought no review of the estimated settlements described in Paragraph 452.

455. The United States holds liens on the lands of Raymond Colliery reflecting unpaid corporate income taxes owed by Raymond Colliery in the following amounts:

| Fiscal Year Ending | Tax and Lien Fees | Penalties and Interest to 12/31/83 | Total due 12/31/83 |
|---|---|---|---|
| 6/30/66 | $35,799.52 | $1,444.08 | $37,276.35 |
| | 32.75 | | |
| 6/30/67 | 96,861.44 | 1,629.30 | 98,490.74 |
| 6/30/68 | 1,125,650.72 | 897,350.42 | 2,023,033.89 |
| | 32.75 | | |
| 6/30/69 | 478,253.23 | 664,441.00 | 1,142,726.98 |
| | 32.75 | | |
| 6/30/71 | 218,269.92 | 273,267.21 | 491,569.88 |
| | 32.75 | | |
| 6/30/72 | 32.75 | 19,939.65 | 19,972.40 |
| 6/30/73 | 16,800.00 | 21,774.49 | 38,607.24 |
| | 32.75 | | |
| Totals | $1,971,881.33 | $1,879,846.15 | $3,851,677.48 |

456. The United States made an assessment on September 17, 1973 for corporate income taxes owed by Raymond Colliery for fiscal year ending June 30, 1967 in the principal amount of $44,667.06.

457. The United States made an assessment on September 17, 1973 for corporate

income taxes owed by Raymond Colliery for fiscal year ending June 30, 1968 in the principal amount of $827,765.85.

458. The remaining federal corporate income taxes owed by Raymond Colliery and listed in paragraph 455 were assessed between April 3, 1979 and April 22, 1981.

459. The United States holds liens against the lands of Raymond Colliery reflecting unpaid corporate income taxes owed by Great American in the following amounts:

| Fiscal Year Ending | Tax and Lien Fees | Interest and Penalties through 12/31/83 | Total due 12/31/83 |
|---|---|---|---|
| 6/30/75 | $2,244,670.75 | $2,615,445.43 | $4,860,148.43 |
| | 8.50 | | |
| | 23.75 | | |

460. The corporate income taxes owed by Great American and listed in Paragraph 459 were assessed between July 30, 1979 and August 25, 1980.

461. Notices of federal tax liens for the taxes described in Paragraphs 455 and 459 were filed and refiled.

462. The amounts claimed by McClellan Realty to be due as of December 31, 1983 on the direct mortgages assigned by IIT to McClellan Realty, including principal and interest through October 31, 1983, are:

| | |
|---|---|
| Raymond Colliery | $7,252,508.60 |
| Blue Coal | 9,756,410.06 |
| Olyphant Associates | 155,203.96 |
| Glen Nan, Inc. | 155,203.96 |
| Total | $17,319,326.58 |

463. The above amounts claimed by McClellan Realty to be due on the direct mortgages do not include additions for attorney fees or late fees.

464. The above amounts claimed by McClellan Realty to be due on the direct mortgages include the following payments of real property taxes which have been added to the liens of the mortgages:

| | |
|---|---|
| Raymond Colliery | $502,176.85 paid on December 16, 1976 by L. Robert Lieb, Trustee, to Lackawanna County Tax Claim Bureau. |
| Blue Coal | $80,303.18 paid by IIT to Luzerne County Tax Claim Bureau. |

465. Lackawanna County through its Tax Claim Bureau holds liens in the aggregate amount of $192,582.88 against 129 parcels of Raymond Colliery's lands representing unpaid county, school and borough taxes due from Raymond Colliery for years 1981 and 1982.

466. The lands to which the Lackawanna County liens attach are located in the City of Scranton, the Boroughs of Archbald, Blakely, Jermyn, Jessup, Mayfield and Taylor, and the Townships of Carbondale and Fell.

467. The Scranton Sewer Authority holds liens in the aggregate amount of $62,929.50 against 34 parcels of Raymond Colliery's lands representing unpaid sewer assessments due from Raymond Colliery between September 27, 1969 and December 29, 1972.

468. The Scranton Sewer Authority also claims a lien in an unspecified principal amount against a Raymond Colliery parcel located at 326–328 Charles Street, Scranton, representing an unpaid sewer assessment, said lien being filed December 2, 1969.

469. The lands to which the Scranton Sewer Authority liens attach are located in the City of Scranton.

470. The Scranton Sewer Authority liens were filed between December 12, 1969 and June 26, 1973.

471. The Borough of Olyphant holds liens in the aggregate amount of $1461.34 against 4 undesignated parcels of Raymond Colliery's lands located in the Borough of Olyphant representing unpaid paving liens.

472. The Borough of Olyphant liens were filed on November 15, 1983.

473. The Lackawanna River Basin Sewer Authority holds liens in the aggregate amount of $109,695.25 against 65 parcels of Raymond Colliery's land representing unpaid sewer assessments due from Raymond Colliery and Tabor Court for years unspecified by the parties.

474. The lands to which the Lackawanna River Basin Sewer Authority liens attach are located in the Boroughs of Archbald, Blakely, Jermyn, Jessup, Mayfield and Throop and in the Townships of Carbondale and Fell.

475. The Lackawanna River Basin Sewer Authority liens were filed between January 17, 1975 and August 1, 1977.

476. The Borough of Taylor holds a lien against Raymond Colliery in the principal amount of $1,000.00 representing unreimbursed expenses incurred by the Borough of Taylor when demolishing and removing a dangerous structure on July 15, 1976 situated on a Raymond Colliery parcel located in the Borough of Taylor.

477. The Borough of Taylor lien was filed on December 15, 1976.

478. The Estate of William R. Henkelman holds a lien in the aggregate principal amount of $3,350.00 representing an unpaid arbitrators' award entered August 30, 1977 against Raymond Colliery in the case of William R. Henkelman vs. Raymond Colliery Co., Inc., No. 547, January Term, 1976 (Court of Common Pleas, Lackawanna County).

479. The Cleveland Defendants paid by cash a total of $5.5 million in settlement of this lawsuit and other related lawsuits. Of that amount, $3,000,000.00 was agreed by the parties to the settlement to be in payment of Raymond Colliery's debts, $2,430,-000.00 was agreed by the parties to the settlement to be in payment of Blue Coal's debts, and $70,000.00 was agreed by the parties to the settlement to be in payment of Glen Nan's debts.

480. The Gillen Defendants paid a total of $600,000.00 in settlement of this lawsuit and other related lawsuits. Of that amount, $330,000.00 was agreed by the parties to the settlement to be in payment of Raymond Colliery's debts; $262,000.00 was agreed by the parties to the settlement to be in payment of Blue Coal's debts, and $8,000.00 was agreed by the parties to the settlement to be in payment of Glen Nan's debts.

481. As part of the settlements the Gillen and Cleveland Defendants agreed not to seek recovery on the notes mentioned in Paragraphs 411, 412, and 413.

### III. Discussion.

On November 26, 1973, Raymond Colliery, Blue Coal, Glen Nan and Olyphant Associates each delivered a direct mortgage on its lands to IIT. On the same date these companies and all of the other companies in the Raymond Group delivered mortgages to IIT as part of their guarantee of the entire loan by IIT. The first main issue before the Court is what protection, if any, should be accorded the IIT direct mortgages in the hands of McClellan Realty which asserts that the direct mortgages on the lands of the Raymond Group are valid either in part or in their entirety as against the Creditors. McClellan Realty has made no argument that the IIT guarantee mortgages executed by each member of the Raymond Group are valid against the Creditors. Subsumed within the first issue is the question of whether McClellan Realty and other related corporations are entitled to liens for taxes paid on behalf of Raymond Colliery, some of which taxes were added to the lien of the IIT mortgages.

We note that our prior findings relating to Pagnotti Enterprises are applicable to its subsidiary, McClellan Realty, to whom Pagnotti Enterprises directed the mortgages to be assigned. For purposes of determining the rights of McClellan Realty *vis a vis* the Creditors, McClellan Realty's status is identical to that of Pagnotti Enterprises.

The second main issue before the Court is the priority to be accorded the various liens, including the IIT direct mortgage on the lands of Raymond Colliery. The Court is not concerned with the priority of liens, including that of the IIT direct mortgages, on the lands of Blue Coal and Glen Nan because that is a matter to be resolved by the Bankruptcy Court in the light of this Court's opinions. The third main issue before this Court is the Trustee's request for punitive damages against McClellan Realty.

A. Status of the IIT Mortgages in the Hands of McClellan Realty.

1. Possible Extinction of McClellan's Lien Under U.C.C. § 9–504.

McClellan Realty foreclosed on its security interests in certain personalty of Raymond Colliery at a private sale conducted on February 28, 1978 at which the assets foreclosed upon were sold to Loree Associates for $50,000. McClellan Realty also foreclosed on the stock of Raymond Colliery at a private sale on October 6, 1978 at which the stock was sold to Joseph Solfanelli as Trustee for the Pagnotti Group for $1.00. The Creditors argue that these foreclosure sales were unreasonable and that because of such unreasonableness the obligation secured by the mortgages was satisfied.

■ These foreclosure sales clearly did not comport with the requirements of § 9–504(3) of the Uniform Commercial Code in effect as of the dates of the sales for a number of reasons. 12A Pa.Stat. § 9–504(3) (repealed November 1, 1979).

First, a secured party cannot bid in at its own private foreclosure sale unless the collateral is "of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations...." 12A Pa.Stat. § 9–504(3) (repealed November 1, 1979). The stock of Raymond Colliery and the other personalty sold by McClellan Realty at the private foreclosure sales do not fit into either of the above categories. See Alliance Discount Corp. v. Shaw, 195 Pa.Super. 601, 604, 171 A.2d 548 (1961).

Second, McClellan Realty notified only Hyman Green, the then sole stockholder of Raymond Colliery, of the private foreclosure sales. Under § 9–504(3) McClellan Realty was obligated to give notice of the sale to the "debtor". Blue Coal and Glen Nan, among others, were guarantors of the IIT obligation secured by the assets of Raymond Colliery and as such were debtors as defined in § 9–105(d) of the Pennsylvania Uniform Commercial Code. 12A Pa. Stat. § 9–105(d) (repealed November 1,

1979). They were, therefore, entitled to notice of the foreclosure sales and because they were in bankruptcy notice should have been given to the Trustee in Bankruptcy for Blue Coal and Glen Nan. National Acceptance Co. of Am. v. Medlin, 538 F.Supp. 585, 587 (N.D.Ill.1982); Rushton v. Shea, 423 F.Supp. 468 (D.Del.1976). No such notice was given. In addition, McClellan Realty has produced no credible evidence that the prices bid for the collateral were commercially reasonable.

■ When there has been a commercially unreasonable disposition of collateral, the question arises as to the effect of that disposition on the secured party's right to recover the balance of the debt. The Creditors claim that McClellan Realty's commercially unreasonable disposition of the collateral gives rise to a presumption under Pennsylvania law that the value of the collateral sold equalled the indebtedness secured. The Creditors argue that because McClellan Realty has produced no evidence to rebut this presumption the debt secured by the IIT mortgages has been extinguished. In support of the above argument, the Creditors point to the recent Pennsylvania Supreme Court decision in Savoy v. Beneficial Consumer Discount Co., —— Pa. ——, 468 A.2d 465 (1983).

The Creditors' reliance on Savoy is misplaced. The Pennsylvania Supreme Court held in Savoy that a secured party who sold collateral in a commercially unreasonable manner must rebut a presumption that the value of the collateral sold equalled the indebtedness secured. Failure to rebut this presumption will bar the secured party from obtaining a deficiency judgment against the debtor. The issue in this case is whether the Savoy presumption would extinguish the secured party's rights in other collateral of the debtor in which the secured party has a security interest.

Application of the Savoy presumption to this situation would result in depriving McClellan Realty, as the successor to IIT, of in rem rights against the Raymond Group. Despite our past record of somewhat dubious oracularity, we predict that

the Supreme Court of Pennsylvania will not apply the *Savoy* presumption to extinguish security interests in other collateral of the debtor. *See First Pennsylvania Bank, N.A., v. Lancaster County Tax Claim Bureau, et al.,* — Pa. —, 470 A.2d 938 (1983). We will therefore deny the Creditors' request that this Court conclude that the debt secured by the IIT mortgages was extinguished because of McClellan Realty's unreasonable foreclosure sales of Raymond Colliery's assets.

2. McClellan Realty's Claim for Protection of Its Mortgages Against the Creditors.

The Creditors argue that they are entitled under section 359(1) of the Pennsylvania Fraudulent Conveyance Act to set aside the IIT mortgages to the extent necessary to satisfy their claims. Section 359 of the Act provides as follows:

(1) Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser:

(a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim; or

(b) Disregard the conveyance, and attach or levy execution upon the property conveyed.

(2) A purchaser who, without actual fraudulent intent, has given less than a fair consideration for the conveyance or obligation may retain the property or obligation as security for repayment.

39 Pa.Stat. §§ 359(1), (2).

McClellan Realty argues that in the particular complex posture of this litigation it is entitled to a lien position ahead of the Creditors with respect to all or a portion of the IIT mortgages.

McClellan Realty first argues that the Creditors are not entitled to have the IIT mortgages set aside under § 359(1) to the "extent necessary to satisfy [their] claims" but are limited to a recovery equal to the amount of diminution of the assets of the Raymond Group caused by the November 26, 1973 fraudulent conveyances. *Newman v. First National Bank of East Rutherford,* 76 F.2d 347, 350 (3d Cir.1935). *See In re MortgageAmerica Corp.,* 714 F.2d 1266, 1272 (5th Cir.1983); *Damazo v. Wahby,* 269 Md. 252, 305 A.2d 138, 142 (1973). McClellan Realty notes that the Court determined that the IIT mortgages were fraudulent conveyances partly because $4,085,500 of the IIT loan proceeds were wrongfully funnelled through the Raymond Group to the selling shareholders in payment of the purchase price of Raymond Colliery's stock. McClellan Realty claims that a return of $4,085,500 to the Raymond Group would cure any injury to the Creditors caused by the November 26, 1973 fraudulent conveyances. It further claims that more than $4,085,500 has already been returned to the Raymond Group as a result of the $6,100,000 received by the Creditors and the Commonwealth under the terms of the settlement agreements with the Cleveland and Gillen Defendants.

■ The payment of the $6,100,000 has not placed the Creditors in the same or similar position which they held with respect to the Raymond Group prior to the November 26, 1973 fraudulent IIT mortgages transaction. Since November 26, 1973, the Raymond Group paid $4,589,640 on the fraudulent IIT mortgages. Also since November 26, 1973, the amount owed by the Raymond Group on the mortgages has greatly increased because of the very substantial interest charges provided for in the Note Purchase and Loan Agreement which are claimed by McClellan Realty to be at least $11,501,850.89. The Creditors therefore would not be placed in the same or similar position which they held with respect to the Raymond Group in 1973 merely by replacing the $4,085,500 of IIT loan proceeds that were misused on November 26, 1973.

■ We also disagree with McClellan Realty's argument that the settlement mo-

nies paid to the Creditors and the Commonwealth by the Gillen and Cleveland Defendants should be deducted from the recovery to which the Creditors are entitled from McClellan Realty. The Creditors have claimed in this litigation that the Gillen and Cleveland Defendants are liable for sales of Raymond Group assets made after November 26, 1973 to satisfy the Raymond Group's debt to IIT and others. There is no basis for this Court to apply the $6,100,-000 paid by the Gillens and Clevelands to particular injuries suffered by the Creditors as the result of the fraudulent conveyances. Moreover, the settlement agreements provided that the monies paid were also in settlement of other lawsuits by the Creditors and the Commonwealth against the Gillens and Clevelands. There is no basis on the present record for a conclusion by this Court that the $6,100,000 paid by the Gillens and Clevelands pursuant to the settlement agreements was intended solely to compensate the Creditors and the Commonwealth for damages flowing from the Gillens' and Clevelands' acceptance of the IIT loan proceeds on November 26, 1973.

■ McClellan Realty further argues that the mortgages are entitled to protection under § 359(2) of the Act by reason of the payment of $4,047,786.00 by Pagnotti Enterprises to IIT for the assignment of the mortgage to McClellan Realty. Section 359(2) of the Pennsylvania Fraudulent Conveyance Act permits a purchaser to retain a fraudulently conveyed property or obligation as security for repayment where such a purchaser (1) is without actual fraudulent intent and (2) has given less than a fair consideration for the conveyance or obligation. 39 Pa.Stat. § 359(2). McClellan Realty does not fit within the literal meaning of the words of the statute.

Section 359(2) has no application to McClellan Realty because although this Court found that Pagnotti Enterprises was without actual fraudulent intent, *Gleneagles II,* 571 F.Supp. at 957, we did not find that Pagnotti Enterprises gave "less than a fair consideration" for the IIT mortgages. 39 Pa.Stat. § 359(2). Under the Act, "fair consideration" is defined. Fair consideration is given for a property or obligation "[w]hen, in exchange for such property or obligation, as a fair equivalent therefor and in good faith, property is conveyed...." 39 Pa.Stat. § 353(a). In *Gleneagles II,* this Court concluded that while Pagnotti Enterprises paid a fair equivalent for the IIT mortgages it did not do so in good faith. We concluded that Pagnotti Enterprises either knew or should have known that the November 26, 1973 transaction rendered the Raymond Group insolvent and with insufficient working capital. We also concluded that Pagnotti Enterprises knew or should have known that the IIT mortgages were not supported by fair consideration because of the simultaneous diversion of the $4,085,500. 571 F.Supp. at 958. While the decision of the Court in *Gleneagles II* rested on our determination that Pagnotti Enterprises should have known of the fraudulent nature of the mortgages, we seriously questioned Pagnotti Enterprises' assertion that it did not have actual knowledge of the fraudulent nature of the mortgages. The Court concluded that at least one official of Pagnotti Enterprises knew more about the IIT mortgages transaction than he admitted on the stand. The findings of the Court relating to Pagnotti Enterprises' actual and imputed knowledge of the fraudulent nature of the IIT mortgages prevent any finding that Pagnotti Enterprises purchased the IIT mortgages in good faith. *Cohen v. Sutherland,* 257 F.2d 737, 742 (2d Cir.1958); *Epstein v. Goldstein,* 107 F.2d 755, 757 (2d Cir.1939); *Gleneagles I,* 565 F.Supp. at 574.

■ This Court acts as a court of equity when determining the relief appropriate under the Pennsylvania Uniform Fraudulent Conveyance Act and in cases such as this one brought under § 7403 of the Internal Revenue Code, 26 U.S.C. § 7403. *United States v. Overman,* 424 F.2d 1142, 1146 (9th Cir.1970); *Greater Valley Terminal Corp. v. Goodman,* 415 Pa. 1, 202 A.2d 89 (1964).

■ McClellan asks protection of the IIT mortgages to the extent that McClellan

Realty paid consideration to IIT. We have examined the case law cited by McClellan Realty and have found no support for the proposition that a purchaser such as McClellan Realty who is not entitled to protection of its position under § 359(1) or (2) may nonetheless be awarded an equitable lien for consideration paid to his transferor. *See Peoples Savings & Dime Bank & Trust Co., v. Scott,* 303 Pa. 294, 298, 154 A. 489, 490 (1931).

McClellan Realty also requests proportional protection of its mortgages based upon the extent that the IIT loan proceeds initially benefitted the Raymond Group. McClellan Realty claims this Court found in *Gleneagles I,* 565 F.Supp. at 570, that $2,914,500 or 41.64% of the IIT loan proceeds went to the benefit of the Raymond Group and that thus it is entitled to protection of 41.64% of each direct mortgage executed by a member of the Raymond Group.

■ McClellan Realty's argument rests on the incorrect assumption that some portions of the IIT mortgages are valid as against the Creditors. In *Gleneagles I,* 565 F.Supp. at 580, 586, this Court found that IIT and Durkin engaged in an intentionally fraudulent transaction on November 26, 1973. The IIT mortgages are therefore invalid in their entirety as to creditors. *Iscovitz v. Filderman,* 334 Pa. 585, 6 A.2d 270 (1939). McClellan Realty asserts that because it was not found to have purchased the IIT mortgages with actual or imputed knowledge that the mortgages were intentionally fraudulent conveyances, the mortgages should be treated as merely constructively fraudulent conveyances in the hands of McClellan Realty and that the mortgages should be upheld proportionately to the extent that the proceeds thereof were used to benefit the Raymond Group. *See e.g., Taylor v. Kaufhold,* 379 Pa. 191, 108 A.2d 713 (1954); *Peoples Savings & Dime Bank & Trust Co. v. Scott,* 303 Pa. at 298, 154 A. at 490.

■ We find no authority for this position. Unless the subtransferee of a fraudulent conveyance purchases in good faith as set forth in 39 Pa.Stat. § 359(1), it stands in the shoes of its assignor. *In Re Trans-United Industries, Inc.,* 351 F.2d 605 (2d Cir.1965); *Davis v. Hudson Trust,* 28 F.2d 740 (3d Cir.1928); *United States v. West,* 299 F.Supp. 661 (D.Del.1969); *In Re Brueck and Wilson Co.,* 258 F. 69 (S.D.N.Y.1919); *Bean v. Commercial Securities Co.,* 25 Tenn.App. 254, 156 S.W.2d 338 (1941). McClellan was not a purchaser for fair consideration without knowledge or notice of the fraud for the reasons previously given and holds the mortgages subject to the claims of the Creditors.

■ In addition, fraudulent liens previously sold are reduced for amounts which have already been paid on the liens. *In Re Peoria Braumeister Co.,* 138 F.2d 520, 523 (7th Cir.1943). $4,589,640 was paid on the mortgages by the Raymond Group before the mortgages were assigned to McClellan Realty. Thus, even assuming that a valid portion of the IIT mortgages originally existed, that portion was extinguished by the payments on the debt in excess of that portion made by the mortgagors before the assignment of the IIT mortgages.

■ Finally, if there were any need to balance the equities in this case as between McClellan Realty and the Creditors, the equities clearly favor the Creditors. As this Court noted in *Gleneagles II,* we questioned Pagnotti Enterprises' assertion that it did not have actual knowledge of matters which would have caused it to conclude that the IIT mortgages were fraudulent conveyances within the meaning of §§ 354 and 355 of the Pennsylvania Fraudulent Conveyance Act. We also concluded that Pagnotti Enterprises was clearly on notice as to numerous facts which if reasonably investigated would have led Pagnotti Enterprises to conclude that the mortgages were fraudulent conveyances. Assuming that Pagnotti Enterprises was aware of the fraudulent nature of the IIT mortgages when it purchased them, it clearly would be inequitable to protect McClellan Realty's position as against the Creditors. Even if

Pagnotti Enterprises were merely on notice as to the fraudulent nature of the IIT mortgages, it would likewise be inequitable to favor McClellan Realty's position over that of the Creditors who were not on notice of the fraudulent nature of the mortgages and who could not protect themselves. Unlike the Creditors, Pagnotti Enterprises could have avoided its present predicament if it had exercised ordinary prudence.

 Moreover, equity will not act to protect a party who has unclean hands. As discussed in detail in *Gleneagles II*, Pagnotti Enterprises participated in the November 26, 1973 transaction to some extent. 571 F.Supp. at 955–56. It also acted in bad faith *vis a vis* the Creditors after its purchase of the IIT mortgages.

Tabor Court Realty is a subsidiary of Loree Associates. McClellan Realty is a subsidiary of Pagnotti Enterprises. Pagnotti Enterprises and Loree Associates are both owned by the Pagnotti, Tedesco, and Ventre families. In the transactions at issue Loree Associates and Pagnotti Enterprises were joint venturers.

On October 6, 1978, the stock of Raymond Colliery was foreclosed upon by McClellan Realty and sold for $1.00 to Joseph Solfanelli as Trustee for Pagnotti Enterprises. Thus, by October 6, 1978, related entities owned the stock of Raymond Colliery, the IIT mortgages, and thought they owned the land of Raymond Colliery although they did not own the land because both of the 1976 and 1980 tax sales were invalid. During this period of common ownership, no monies were paid on the IIT mortgages.

The aggregate balances of the mortgages are claimed by McClellan Realty to have increased by reason of interest accruals from $5,817,475.69 on January 22, 1977 to $17,319,326.58 on October 31, 1983. Despite the default on the IIT mortgages, McClellan Realty never foreclosed on the lands of Raymond Colliery.

Also during this period of common ownership, because no real estate taxes were paid on the lands of Raymond Colliery by Tabor Court or any other entity Lackawanna County again listed the lands of Raymond Colliery for tax sale in 1980. At the 1980 tax sale, Joseph Solfanelli, on behalf of Gleneagles, purchased the Raymond Colliery lands. Mr. Solfanelli was acting on behalf of James Tedesco, a principal of both Loree *Associates* and Pagnotti Enterprises at the 1980 tax sale.

The decision by Pagnotti Enterprises, McClellan Realty, Tabor Court, Loree Associates and Gleneagles (hereinafter collectively called the Pagnotti Defendants) not to pay the real estate taxes on the lands of Raymond Colliery and instead simply to repurchase them at approximately the upset bid price at the 1980 tax sale was part of a scheme to divest the substantial liens on the lands.

The decision not to foreclose on the IIT mortgages on the lands of Raymond Colliery was also part of a plan to discourage Raymond Colliery's other creditors from seeking to foreclose on their liens. With the exception of certain county and other municipal liens and the Commonwealth liens, the IIT mortgages appeared to be first liens on all the lands of Raymond Colliery. As the IIT mortgages increased in amount, the chances of a junior lienor foreclosing on the lands of Raymond Colliery decreased. In addition, the Pagnotti Defendants may have been attempting to achieve a highly favorable position in the Blue Coal and Glen Nan bankruptcy proceedings. As part of the November 26, 1973 transaction, Blue Coal and Glen Nan executed guarantee mortgages for the entire IIT mortgage debt. Thus, by declining to foreclose on the lands of Raymond Colliery and permitting the debt secured by the IIT mortgages to increase, Pagnotti Enterprises could have claimed the bulk of the proceeds from the liquidation of Blue Coal and Glen Nan's assets.

During the trial in this case, James Tedesco testified that the reason McClellan Realty failed to foreclose on the IIT mortgages against the assets of Raymond Colliery was that an attorney for a third party stated to him that if an attempt to fore-

close on the mortgages were made, that attorney would file a bankruptcy petition against Raymond Colliery. Assuming that this threat was in fact made, we find it extremely difficult to believe that it would have brought about the decision by McClellan Realty not to foreclose on the mortgages. After the 1976 tax sale, Raymond Colliery was purportedly stripped of its most valuable asset, i.e., its land. Hence, the filing against Raymond Colliery of a petition in bankruptcy long after the 1976 tax sale at which the lands of Raymond Colliery were purportedly sold to Tabor Court would have had little or no effect on McClellan Realty's ability to foreclose on its mortgages encumbering the lands.

In short, in light of the behavior of the Pagnotti Defendants after their purchase of the IIT mortgages, McClellan Realty is not entitled to an equitable lien representing any portion of the IIT mortgages.

3. The Pagnotti Defendants' Lien for Taxes Paid on Behalf of Raymond Colliery.

Beginning in 1976, various payments were made by the Pagnotti Defendants on account of Raymond Colliery's delinquent taxes. Some of these payments were made as bids on the lands of Raymond Colliery at the Lackawanna County tax sales. The prices paid by the Pagnotti Defendants had the effect of paying delinquent realty taxes owed by Raymond Colliery and discharging liens for those taxes from the lands of Raymond Colliery. The Pagnotti Defendants seek first liens on the lands of Raymond Colliery for such payments.

These tax payments are as follows:

A. *Payments by L. Robert Lieb.*

| | |
|---|---|
| Payment of Commonwealth Taxes (Finding of Fact 418, *supra*) | $ 44,368.74 |
| Payment of pre-1974 Lackawanna County real estate taxes (Gleneagles II, 571 F. Supp. at 947 (Finding of Fact 166)) | 447,786.13 |
| Payment of pre-1974 City of Scranton Taxes (Finding of Fact 419, *supra*) | 11,122.25 |

B. *Payments by Tabor Court*

| | |
|---|---|
| Bid at 1976 tax sale (Gleneagles II, 571 F.Supp. at 948 (Finding of Fact 190)) | $385,000.00 |
| Less refunds for overpayments and duplicate payments in bid at 1976 tax sale (Gleneagles II, 571 F.Supp. at 949 (Findings of Fact 202, 203, 204 and 205)) | (38,937.00) |

C. *Payment by McClellan Realty*

| | |
|---|---|
| Payment of City of Scranton, 1974, 1975, and 1976 delinquent real estate taxes (Finding of Fact 420, *supra*) | $ 23,179.36 |

D. *Payment by Gleneagles*

| | |
|---|---|
| Bid of Gleneagles at 1980 tax sale (Finding of Fact 445, *supra*) | $629,225.43 |

Raymond Colliery's Commonwealth and pre-1974 real estate taxes were first liens on the lands of Raymond Colliery and were paid by L. Robert Lieb when the Pagnotti Defendants were neither owners of the land nor owners of the IIT mortgages. Because of this Court's conclusion in *Gleneagles II* that the 1976 tax sale was invalid, the 1976 Tabor Court bid on the lands of Raymond Colliery was tantamount to a payment of Raymond Colliery's real estate taxes and likewise was also a payment made before the Pagnotti Defendants owned the lands of Raymond Colliery or the IIT mortgages. These tax payments discharged liens on the lands of Raymond Colliery which were ahead of those claimed by the United States. Equitably, the Pagnotti Defendants should now receive a lien position reflecting these tax payments ahead of the lien position accorded the United States. Likewise, because the above tax payments by the Pagnotti Defendants discharged liens ahead of the liens claimed in this litigation by the various counties and other municipalities, the Pagnotti Defendants should receive liens reflecting the tax payments ahead of those lienors.

The 1974, 1975, and 1976 taxes due the City of Scranton were not paid by the Pagnotti Defendants until April, 1977 because the City of Scranton taxing personnel were unable or unwilling to calculate the amounts owed by Raymond Colliery for those years before the 1976 tax sale. However, the Pagnotti Defendants attempted to pay the 1974, 1975, and 1976 City of Scranton taxes as part of Tabor Court's bid at the 1976 tax sale. In our view, the April, 1977 payment to the City of Scranton should be treated in the same manner as the 1976 tax sale bid. The Pagnotti Defendants will therefore also be awarded a lien ahead of the United States and the

counties and other municipalities for the 1974, 1975 and 1976 taxes paid to the City of Scranton.

On October 6, 1978 Joseph Solfanelli on behalf of the Pagnotti Defendants bought in the Raymond Colliery stock for $1.00 and became President of the corporation. Thereafter, the Pagnotti Defendants as officers, directors, and stockholders of Raymond Colliery, had an obligation to pay current taxes on the lands of the corporation and to treat the creditors of Raymond Colliery fairly. However, they attempted to run the lands through the tax sale in 1980 and purchase the lands through another Pagnotti corporation in order to divest liens of the Creditors, particularly the United States. Balancing the equities we decline to award the Pagnotti Defendants liens ahead of those claimed by the United States and the county and other municipalities for the taxes paid at the 1980 tax sale but will postpone that lien to a position which is immediately ahead of the mortgages themselves.

It is appropriate to make several observations regarding the equitable liens this Court will award the Pagnotti Defendants. First, it should be noted that McClellan Realty is the Pagnotti Defendant entitled to liens reflecting the December 16, 1976 tax payments by L. Robert Lieb. These payments were made from the escrow account created by IIT and Pagnotti Enterprises prior to the assignment of the IIT mortgages to McClellan Realty. Pagnotti Enterprises reimbursed IIT for its contribution to the escrow account and the December 16, 1976 payments were added to the balance of the IIT mortgages assigned to McClellan Realty.

Second, the December 16, 1976 tax payments by L. Robert Lieb and the April, 1977 payment to the City of Scranton by McClellan Realty for delinquent 1974, 1975, and 1976 real estate taxes were added to the balance of the IIT mortgages. However, because the mortgages were fraudulent as to creditors, we decline to award equitable liens reflecting these payments with interest at the rate provided for in the IIT mortgages and as blanket liens on the assets of Raymond Colliery. Recovery of these payments at the statutory interest rate and from the proceeds of the sales of the particular parcels against which the taxes were liens is fair to McClellan Realty.

Third, all of the above tax payments by the Pagnotti Defendants are listed in aggregate amounts. With the exception of the December 16, 1976 payment for Commonwealth taxes, the Pagnotti Defendants must still produce evidence as to all tax payments proving to which parcels the tax payments related and the amounts of the liens on each such parcel. Because Commonwealth taxes were liens on all parcels of Raymond Colliery property, 72 Pa.Stat. § 1401, the equitable lien accorded McClellan Realty for payment of those taxes will be an equitable lien against all parcels of Raymond Colliery land generally.

**B. The Order of Liens on the Lands of Raymond Colliery.**

The jurisdiction of this Court was invoked under 26 U.S.C. § 7403 which permits the United States to bring a civil action in federal court to enforce federal tax liens. Section 7403(c) provides as follows:

> The court shall ... proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States.....

26 U.S.C. § 7403(c).

The following entities possess liens against the lands of Raymond Colliery: the United States, the Commonwealth of Pennsylvania, McClellan Realty, Lackawanna County, the Borough of Olyphant, the Scranton Sewer Authority, the Lackawanna River Basin Sewer Authority, the Borough of Taylor, and the Estate of William R. Henkelman. The principal amounts of

the liens claimed by the above entities to the extent the Court was able to ascertain such amounts are set forth in the Findings of Fact.

 Federal law determines the priority of a federal tax lien. *Aquilino v. United States*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). Except as provided in 26 U.S.C. § 6323, the federal rule of priority is first in time, first in right. *United States v. City of New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954). A federal tax lien arises as of the date the tax is assessed. 26 U.S.C. § 6323(b)(6) provides that "super-priorities" are to be given to certain county and other municipal tax liens notwithstanding that such liens may have arisen after the federal tax lien. Thus, under federal law the county and other municipal liens encumbering the lands of Raymond Colliery are entitled to priority over the federal tax liens.

 State law determines the priority of liens among non-federal lienors. Pennsylvania law provides that the Commonwealth's tax liens are a first lien on all of its taxpayers' real and personal property. 72 Pa.Stat. § 1401. Delinquent county real estate taxes and municipal claims, including sewer, paving and demolition liens, follow Commonwealth liens in that order.

 There is, therefore, a conflict between the rules of priority established by federal and state law with respect to the lien positions to be accorded the liens of the Commonwealth, the county and the other municipalities giving rise to a so-called "circular priority" problem. When circular priority problems surface, federal law and the first in time, first in right rule determine the position of the federal tax liens and state law determines the priorities around the federal tax liens. Because Pennsylvania law provides a priority for Commonwealth taxes superior to that provided to county and other municipal claims, the Commonwealth may take advantage of the federal "super-priorities" accorded county and other municipal liens in 26 U.S.C. § 6323. This entitles the Commonwealth to priority over federal tax liens as provided by 26 U.S.C. § 6323 in the amount of the appropriate municipal liens. The county and other municipal liens then receive a position following the lien positions accorded the claims of the United States and the Commonwealth.

The following chart indicates the order of priority of liens on the lands of Raymond Colliery. Those lienors marked with an asterisk hold liens as described at the right of the asterisk encumbering particular parcels of Raymond Colliery land. The lienors not marked with an asterisk hold liens as described at the right of the asterisk on all of the lands of Raymond Colliery.

| Lienor | Description |
|---|---|
| 1. McClennan Realty | Payment of Commonwealth taxes by L. Robert Lieb. (Finding of Fact 418 *supra*.) |
| 2. McClellan Realty * | Payment of Lackawanna County and City of Scranton taxes by L. Robert Lieb (*Gleneagles II*, Finding of Fact 166 and Finding of Fact 419, *supra*.) |
| 3. Tabor Court * | Upset bid paid at 1976 Lackawanna County tax sale minus refunds. (*Gleneagles II*, Findings of Fact 190, 202 and 203.) |
| 4. McClellan Realty * | Payment to City of Scranton of delinquent 1974, 1975 and 1976 real estate taxes. (Finding of Fact 420, *supra*.) |
| 5. Commonwealth * | Municipal and county lien positions assumed by the Commonwealth pursuant to 26 U.S.C. § 6323(b). |
| 6. United States | Federal taxes assessed 9/17/73. (Findings of Fact 456 and 457, *supra*.) |
| 7. Commonwealth | Commonwealth tax liens filed between 4/13/76 and 1/27/77. (Findings of Fact 448, *supra*.) |
| 8. United States | Federal taxes assessed between 4/3/79 and 4/22/81. (Findings of Fact 455, 459, *supra*.) |
| 9. Commonwealth | Tax liens filed 6/11/82 and 7/12/83 (Findings of Fact 447 and 449, *supra*.) |
| | NOTE: These liens will be reduced at the time of distribution for amounts recovered by the Commonwealth pursuant to its priority position under 26 U.S.C. § 6323(b). |
| 10. Lackawanna County * | County, school and borough taxes for 1981 and 1982. (See Finding of Fact 465, *supra*.) |
| 11. Scranton Sewer Authority * | Sewer liens assessed between 9/27/69 and 12/29/72. (Findings of Fact 467 and 468, *supra*.) |
| 12. Borough of Olyphant * | Paving liens encumbering 4 parcels of Raymond Colliery land. (See Finding of Fact 471, *supra*.) |

| Lienor | Description |
| --- | --- |
| 13. Lackawanna River Basin Sewer Authority * | Sewer liens assessed. (Finding of Fact 473, *supra*.) |
| 14. Borough of Taylor * | Demolition lien encumbering one parcel of Raymond Colliery's land filed December 15, 1976. (Finding of Fact 476, *supra*.) |
| 15. Gleneagles * | Tax payments made in connection with the 1980 Lackawanna County Tax sale (Findings of Fact 445, *supra*.) |
| 16. McClellan Realty | IIT Mortgage (See Finding of Fact 462, *supra*.) |
| 17. Estate of William R. Henkelman | Arbitrators award. (Finding of Fact 478, *supra*.) |

This Court was unable to ascertain the principal amounts of certain liens including the "super-priority" liens of the Commonwealth, the Scranton Sewer Authority liens and the IIT mortgages. The Court could not calculate the amount of the super-priority liens of the Commonwealth because it could not determine the principal amount of the liens claimed by the Scranton Sewer Authority. This is based on the fact that no documentation was filed with respect to the Scranton Sewer Authority lien claimed against the tract at 326–328 Charles Street, Scranton. Furthermore, the Court could not determine with accuracy the Scranton Sewer Authority's original assessments, the amounts paid thereon, and the interest calculations. Lastly, the computation by the Scranton Sewer Authority of the aggregate amount of its liens contained an arithmetical reversal and is incorrect.

The Court could not ascertain the principal amount owing on the IIT mortgage against the lands of Raymond Colliery because although we have the interest charged on the IIT mortgages from January 26, 1977, the date McClellan acquired the mortgages, we are unable to ascertain with assurance the principal amount owed on the mortgage as of that date. Finally, the Borough of Olyphant has not provided evidence as to which parcels of Raymond Colliery lands its liens encumber. Hence, no final order respecting the amounts of liens on the lands of Raymond Colliery can be entered at this time. The Court will order the parties to attempt in good faith to agree upon a form of decree consonant with this opinion listing the priority of liens, the original principal amount of each lien, the date the principal accrued, the date the lien attached, the dates and amounts of any principal payments any applicable penalties, the interest rate applicable to the lien if other than 6%, the total interest to April 30, 1984, any record costs relating to the liens, the tract or tracts encumbered if less than all of the lands of Raymond Colliery, and the combined principal and interest owned on each lienor's claim as of April 30, 1984 in gross, if all the lands are subject to the liens, or particularized as to tract or tracts encumbered if less than all of the lands of Raymond Colliery are so encumbered.

The Commonwealth has suggested that in the event insufficient proceeds are realized from the sale of Raymond Colliery's land this Court should apply the doctrine of marshalling of assets to the satisfaction by the creditors of their liens. The doctrine of marshalling of assets requires that where one creditor has two funds or sources from which to seek payment and another creditor has only one, the creditor with two sources must first proceed against the source which the other creditor cannot reach. *Sowell v. Federal Reserve Bank*, 268 U.S. 449, 456, 45 S.Ct. 528, 530, 69 L.Ed. 1041 (1925). Certain of Raymond Colliery's creditors, in particular the United States, have two or more funds from which they can satisfy their liens. In our view, it is premature to reach the question of whether the doctrine of marshalling should be applied in this case.

C. Punitive Damages.

The Trustee in Bankruptcy seeks punitive damages against McClellan Realty in his cross-claim and argues that McClellan Realty should be assessed punitive damages for its failure to investigate the use made of the IIT loan proceeds.

Under Pennsylvania law punitive damages may not be awarded against a party unless that party has been found liable for actual damages. *Hilbert v. Roth*, 395 Pa. 270, 276, 149 A.2d 648 (1959). Because no

compensatory damages have been claimed or will be assessed against McClellan Realty, the Trustee's claim for punitive damages against McClellan Realty is without merit. In addition, McClellan Realty's conduct in this case has not been shown to be sufficiently wanton, reckless or outrageous so as to justify an award of punitive damages.

#### IV. Conclusions of Law.

1–13. The conclusions of law in *Gleneagles I* are incorporated herein by reference.

14–17. The conclusions of law in *Gleneagles II* are incorporated herein by reference.

18. Officers and agents of the Pagnotti Defendants who were also agents and controlling stockholders of Raymond Colliery breached their duty to the creditors of Raymond Colliery to act in good faith with respect to such creditors in connection with the Lackawanna County 1980 tax sale.

19. The United States is entitled to have the IIT direct mortgage on the lands of Raymond Colliery set aside to the extent of the claims of the United States.

20. The Trustee is entitled to have the IIT direct mortgages on the lands of Blue Coal and Glen Nan set aside to the extent of the Trustee's claims.

21. The tax liens held by the Commonwealth of Pennsylvania reflecting unpaid corporate taxes owed by Raymond Colliery for fiscal years ending June 30, 1969 through June 30, 1980 are entitled to priority on the lands of Raymond Colliery over the IIT mortgages.

22. McClellan Realty is entitled to a lien in the principal amount of $44,368.74 against the lands of Raymond Colliery with respect to which Commonwealth taxes were paid by L. Robert Lieb on December 16, 1976.

23. McClellan Realty is entitled to liens in the aggregate principal amount of $458,908.38 on the parcels of Raymond Colliery's land with respect to which pre-1974 Lackawanna County real estate taxes were paid by L. Robert Lieb on December 16, 1976.

24. Tabor Court is entitled to liens in the aggregate principal amount of $346,063.00 on the parcels of Raymond with respect to which Lackawanna County real estate taxes were paid by virtue of Tabor Court's 1976 bid on the lands of Raymond Colliery.

25. McClellan Realty is entitled to liens in the aggregate principal amount of $23,179.36 on the parcels with respect to which City of Scranton 1974, 1975 and 1976 real estate taxes were paid.

26. The United States is entitled to liens on the lands of Raymond Colliery reflecting unpaid federal income taxes assessed against Raymond Colliery and its subsidiaries for fiscal years ending June 30, 1966 through June 30, 1969 and June 30, 1971 through June 30, 1973.

27. The United States is entitled to a lien on the lands of Raymond Colliery reflecting unpaid federal income taxes assessed against Great American and its subsidiaries for fiscal year ending June 30, 1975.

28. The Commonwealth of Pennsylvania is entitled to liens on the lands of Raymond Colliery reflecting unpaid corporate taxes assessed against Raymond Colliery unpaid corporate taxes assessed against Raymond Colliery for fiscal years ending June 30, 1969 through June 30, 1972 and June 30, 1974 through June 30, 1980.

29. Lackawanna County is entitled to liens on 129 parcels of Raymond Colliery's land reflecting unpaid county, school and borough taxes due from Raymond Colliery for 1981 and 1982.

30. The Scranton Sewer Authority is entitled to liens on 35 parcels of Raymond Colliery's lands reflecting unpaid sewer assessments made between September 27, 1969 and December 29, 1972.

31. The Borough of Olyphant is entitled to liens on 4 parcels of Raymond Colliery's land reflecting unpaid paving assessments.

32. The Lackawanna River Basin Sewer Authority is entitled to liens on 65 parcels of Raymond Colliery's lands reflecting un-

paid sewer assessments made on unspeci-fied dates against Raymond Colliery and Tabor Court.

33. The Borough of Taylor is entitled to a demolition lien on one parcel of Raymond Colliery's land preantepenultimate in posi-tion and immediately prior to the Gleneagles' lien for tax payments made in connec-tion with the 1980 tax sale.

34. Gleneagles Investment is entitled to liens in the aggregate principal amount of $629,225.43 on the parcels with respect to which Lackawanna County real estate tax-es were paid by virtue of Gleneagles bid at the 1980 tax sale.

35. McClellan Realty is entitled to a lien against the lands of Raymond Colliery for the principal and interest due on the IIT direct mortgage executed on November 26, 1973 by Raymond Colliery.

36. The Estate of William R. Henkel-man is entitled to a lien against the lands of Raymond Colliery reflecting the unpaid arbitrator's award entered against Ray-mond Colliery on August 30, 1977.

37. The foreclosure sales by McClellan Realty of Raymond Colliery's stock and other assets held on February 28, 1978 and October 6, 1978 were commercially unrea-sonable.

An appropriate order will be entered.